(Nos. 30895, 30896.—■■■■■■■)

THE PEOPLE *ex rel.* Harry A. Lipsky *et al.,* Appellees, *vs.* THE CITY OF CHICAGO *et al.,* Appellants.—JAMES J. CURTIS, Appellant, *vs.* HARRY A. LIPSKY *et al.,* Appellees.

*Opinion filed March 24, 1949—Rehearing denied May 11, 1949.*

EDWARD J. HENNESSY, and HENNESSY, LENNON & KING, (GEORGE W. LENNON, of counsel,) all of Chicago, for appellants.

BERNARD J. KORZEN, KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, SCOTT, MACLEISH & FALK, and JACOB SHAMBERG, (JOSEPH B. FLEMING, EDWARD C. CALDWELL, CHARLES M. PRICE, ROBERT S. CUSHMAN, and JOSEPH N. MORENCY, JR., of counsel,) all of Chicago, for appellees.

Mr. CHIEF JUSTICE FULTON delivered the opinion of the court:

The two cases involved in this appeal were consolidated for trial in the circuit court of Cook County, upon adequate stipulations, and orders of this court provide for the filing of a single set of briefs and for the use of one report of trial proceedings.

On April 5, 1948, the appellant in cause No. 30896 filed a complaint for declaratory judgment as a taxpayer seeking an interpretation of the rights, obligations and powers of the city of Chicago and the Board of Election Commissioners under the Election Code. Thereafter on May 17, 1948, the Board of Election Commissioners of the city of Chicago and Automatic Voting Machine Corporation, in cause No. 30895, filed their petition for writ of *mandamus* against the city of Chicago and certain of its officials to enforce the payment of invoices submitted by Automatic Voting Machine Corporation, and audited and approved by the Board of Election Commissioners, covering certain voting machines delivered under a written contract.

In each of the cases the trial judge has certified that the validity of an ordinance is involved and that the public interest requires an appeal to this court. The validity of the annual appropriation ordinance of the city of Chicago, for the year 1948, is in question, wherein an appropriation of $2,000,000 was made for the purpose of paying the cost of voting machines.

The evidence is voluminous and largely documentary. Most of the facts are not in dispute and are covered by admitted allegations in the pleadings, with the parties differing sharply as to the application and legal effect of such facts.

A brief history of undisputed facts shows that the city of Chicago has heretofore voted to adopt the provisions of the city election law, (Ill. Rev. Stat. 1947, chap. 46,

articles 6, 14 and 18,) providing for a board of election commissioners to conduct elections in that city; that the Board of Election Commissioners of said city is charged with the duty of providing materials and supplies for holding elections in the city of Chicago and that both the Board of Election Commissioners and the city of Chicago are vested and charged with certain rights and duties under the provisions of the Voting Machine Act. (Ill. Rev. Stat. 1947, chap. 46, pars. 24-1 to 24-23). On September 27, 1946, the Board of Election Commissioners resolved to submit to the electors of the city of Chicago at a general election to be held November 5, 1946, the question of the adoption of the use of voting machines in said city. On October 8, 1946, the city council of the city of Chicago referred to such action taken by the Board of Election Commissioners and by resolution declared itself to be in favor of the adoption of the proposition legalizing voting machines in the city of Chicago. On November 5, 1946, the voters of the city of Chicago voted overwhelmingly in favor of such proposition to adopt voting machines. In July, 1947, the city council passed an order authorizing the committee on finance to make a study of the financing of the purchase of voting machines and other matters related thereto.

On September 29, 1947, the city council unanimously passed an ordinance authorizing the issuance of voting machine bonds in the aggregate principal amount of $7,000,000 and providing for the levying of taxes for payment of principal thereof and interest thereon. The ordinance further provided that the bonds should be sold by the city comptroller as "hereinafter ordered by the City Council from time to time as the proceeds are needed for the purposes for which the bonds are authorized." It also provided that no part of the proceeds from the sale of bonds should be spent until an appropriation therefrom was made by the city council prior to the expenditure.

On October 31, 1947, the corporation counsel of the city of Chicago submitted his official written opinion that the Board of Election Commissioners and not the finance committee of said city council had the power and duty to select and purchase voting machines for use in the said city.

On November 4, 1947, the bond ordinance authorizing the issuance of voting machine bonds was submitted to a referendum of the legal voters and resulted in the approval of the $7,000,000 bond issue. There was also an extensive study made by the city and Cook County authorities, together with representative civic bodies, with the idea of developing a program for selecting, supplying and using voting machines in the city of Chicago.

On December 13, 1947, the city council passed its annual appropriation ordinance for the year 1948, in which appeared the following appropriation:

### "5 BOND FUNDS

"No expenditures shall be made from appropriations from bond funds for salaries and wages except for positions specifically authorized, or for construction equipment other than equipment to be installed, or for furniture and supplies, except upon authority of the City Council."

\* \* \*

### "VOTING MACHINE BONDS

(September 29, 1947)

"436-S-4  For the purpose of paying the cost of voting machines $2,000,000.00"

On January 16, 1948, the Board of Election Commissioners called for proposals or bids for the purchase of 450 voting machines for the city of Chicago. Proper notice by mail and by publication was given to the two leading manufacturers of voting machines. Bids were received from Automatic Voting Machine Corporation and Shoup Voting Machine Corporation. Bids were opened on Janu-

ary 23, 1948, and it was found that the Automatic Voting Machine Corporation submitted the lowest bid by approximately $100 per machine.

The machines of both bidders had previously been submitted to the Board of Voting Machine Commissioners of the State of Illinois and had been approved by them as complying with the Voting Machine Act.

On January 23, 1948, the city council of the city of Chicago passed its ordinance levying taxes for the year 1948, an item in said levy being for $300,000 for redemption and interest on voting machine bonds. On February 20, 1948, the Board of Election Commissioners awarded the contract to the Automatic Voting Machine Corporation and on the next day entered into a written contract for the purchase of 450 voting machines. On February 26, 1948, the Board of Election Commissioners transmitted to the chairman of the finance committee of the city council an executed copy of the contract.

The voting machines were delivered pursuant to the contract and the Board of Election Commissioners accepted delivery and issued vouchers covering payment thereof, but the city of Chicago has refused to issue warrants in payment thereof.

In July, 1947, the committee on finance of the city council appointed a subcommittee to consider the proposition of supplying voting machines for the city of Chicago and, after conducting hearings at which demonstrations of the machines of the two companies were made, on March 23, 1948, the subcommittee made a written report to the finance committee. In this report the subcommittee found and reported that the machines of the Automatic Voting Machine Corporation failed to comply with the requirements of the Voting Machine Act. On March 31, 1948, the finance committee approved this report, and thereafter in May, 1948, the city council approved and concurred in the action of the finance committee.

In the taxpayer case (30896) it was contended that the Board of Election Commissioners was without any right, power or authority to purchase any voting machines for use by the voters of the city of Chicago, and that such right and power was vested in the city council of said city. The complaint prayed for an entry of a judgment finding that the purported contract between Automatic Voting Machine Corporation and the Board of Election Commissioners of the city of Chicago was void.

The answer of the defendants asserted that the power and authority to purchase voting machines rested with the Board of Election Commissioners, and that the contract with the Automatic Voting Machine Corporation was valid in all respects.

The *mandamus* case (30895) sought to compel payment by the city of Chicago for the 450 voting machines purchased by the Board of Election Commissioners.

The trial court held in favor of the appellees in both cases. In the suit for declaratory judgment (30896), the court found that the Board of Election Commissioners and not the city council of the city òf Chicago had the power and authority to select and purchase voting machines for use in said city, and that the voting machines of the defendant-appellee the Automatic Voting Machine Corporation substantially met the requirements of the Voting Machine Act of the State of Illinois.

In the *mandamus* case (30895) the circuit court entered final judgment commanding the city of Chicago and the other defendants to sell sufficient voting machine bonds to make payment of the vouchers issued by the Board of Election Commissioners covering the 450 voting machines purchased by the Board.

It is agreed by the parties and can readily be observed that the two main questions in the case are the following:

(1) What are the respective powers of the city council of the city of Chicago and the Board of Election Commis-

sioners with respect to the purchase of voting machines under the Election Code?

(2) Do the voting machines manufactured by the Automatic Voting Machine Corporation comply with the specifications provided in the Election Code?

In point (1) the controversy rages over the construction and effect to be given to the 1941 amendment of section 1 of the Voting Machine Act (now section 24-1 of the Election Code).

Prior to 1941, section 1 of the Voting Machine Act, from the time of its adoption in 1903, provided, in its first sentence, as follows:

"That any body or board of public officials, or any officer or officers charged by law with the duty of providing material and supplies for holding an election or elections in any city, village, incorporated town, county, precinct, election district or other civil division of the state, may at any general or special election submit a proposition to the qualified voters thereof to adopt a voting machine or voting machines, and whenever a majority of the electors of any such city, village, incorporated town, county, precinct, election district or other civil division voting upon said proposition shall have declared therefor may purchase or lease a voting machine or voting machines for any or all of the election precincts for which he, it or they are by law charged with the duty of providing material and supplies for holding an election or elections, at the expense of the city, village, incorporated town, county, precinct, election district or other civil division of the state now chargeable by law with the expenses of the material and supplies for holding general elections in such civil division or divisions." Ill. Rev. Stat. 1939, chap. 46, par. 341.

It is conceded by the appellants that under that section the Board of Election Commissioners of the city of Chicago was vested with the power to select and purchase voting machines for use at the elections within that city,

and it was so held in *Empire Voting Machine Co.* v. *City of Chicago*, 267 Fed. 162. It is admitted that the words, "Any body or board of public officials, or any officer or officers charged by law with the duty of providing materials and supplies for holding an election or elections in any city * * *" refers to the Board of Election Commissioners of the city of Chicago, and that the pronouns "he, it or they" clearly refer back to the equivalent of the Board of Election Commissioners.

In 1941 section 1 of the Voting Machine Act was amended and in 1943 was incorporated as section 24-1 of the Election Code. The first sentence of the section as now amended reads:

"Any body or board of public officials charged by law with the duty of providing material and supplies for holding an election or elections in any city, village, incorporated town, county, or other governmental taxing division of the State, may at any general or special election submit a proposition to the qualified voters thereof to adopt a voting machine or voting machines, and whenever a majority of the electors of any such city, village, incorporated town, county, or other governmental taxing division voting on the question vote favorably upon said proposition *the local authorities shall, subject to the provisions of Section 24-5 of this Act, purchase a voting machine or voting machines* for any or all of the election precincts or election districts, as the case may be, for which he, it or they are by law charged with the duty of providing material and supplies for holding an election or elections, at the expense of the city, village, incorporated town, county, or other governmental taxing division of the state now chargeable by law with the expenses of the material and supplies for holding general elections in such civil division or divisions." Ill. Rev. Stat. 1947, chap. 46, par. 24-1.

It is urged by appellants that the crux of the controversy lies in the portion of the above provision, as italicized,

wherein the legislature has introduced the phrase "local authorities." It is their position that because of the change in the language the conclusion is inevitable that the intention of the legislature was to use the words "local authorities" as meaning "municipal or corporate authorities." In support of their contention they have cited rules of statutory construction as announced by the opinions of this court in *Spiehs* v. *Insull*, 278 Ill. 184, and *People ex rel. Nelson* v. *Wiersema State Bank*, 361 Ill. 75, holding that the judicial construction placed upon a specific provision of a statute prior to the enactment of a general law upon the same subject is not controlling where the two acts are essentially dissimilar. From these and similar decisions they conclude that when the legislature carefully and deliberately amended section 1 of the Voting Machine Act it must have intended to change the law as above construed. Appellants seek further to fortify their position by referring to the clause in section 24-1, "subject to the provisions of Section 24-5 of this Act." In section 24-5, they insist it is clear that "local authorities" refer to the municipal or corporate authorities and call our attention to a familiar rule of statutory construction which states that where the same word is used in different sections of the same legislative act, the presumption is that it is employed with the same definite meaning unless there is something in the act to show clearly that a different meaning was intended. (*Lawton* v. *Sweitzer*, 354 Ill. 620.) That case further contains another familiar rule wherein it is said, "In interpreting a statute the court must consider the legislative intent and purpose as expressed in the act and then determine whether such intent and purpose have been sufficiently manifested by the statute, always keeping in mind the circumstances under which the act was passed and the purpose to be accomplished."

We appreciate the full and complete argument supplied by counsel for the appellants in support of their contention

as well as the zeal with which it is presented, but after a careful reading and repeated rereadings of section 24-1, as well as other sections of the Election Code, we cannot agree with their construction of the legislative intent. Concededly the first lines of section 24-1 refer to the Board of Election Commissioners as being the body whose duty it is to provide materials and supplies for elections and who are authorized at any general or special election to submit to the voters the proposition of adopting voting machines. In the case of a favorable vote on this proposition, "the local authorities" shall, subject to the provisions of section 24-5 of the Election Code, purchase voting machines for all election precincts, "for which he, it or they are by law charged with the duty of providing material and supplies" for holding elections "at the expense of the city." Both appellants and appellees have gone extensively into problems of punctuation and grammatical construction in order to prove their positions, but as we view the question, after vesting in the Board of Election Commissioners the duty to conduct elections as well as to provide the materials and supplies necessary to conduct such elections, as was held in *Empire Voting Machine Co.* v. *City of Chicago,* 267 Fed. 162, the legislature could not reasonably intend to transfer that power and authority without using plain and express language which would clearly show the legislative intent. In our judgment the expression "he, it or they" in the latter part of section 24-1 refers to the Board of Election Commissioners.

It is further insisted by appellants that the first proviso of section 24-1 confirms the existence of power to purchase voting machines in the city council of the city of Chicago.

The portion of section 24-1 in question is unusually lengthy and there is considerable opportunity afforded for argument as to whether this first proviso is applicable to the situation in the present case. The text of the section

immediately preceding the proviso, and also the proviso, reads as follows:

"If such body or board of public officials do not adopt voting machines or do not submit the question of using a voting machine or voting machines, to the voters, such proposition shall be submitted to the voters by the body or board of public officials charged by law with providing materials for holding elections upon the presentation of a petition, at least sixty (60) days before any general election, signed by ten per cent (10%) or more of the voters of any city, village, incorporated town, county, or other governmental taxing division of the state asking the submission of the question of adopting a voting machine or voting machines in such city, village, incorporated town, county or other governmental taxing division of the state. If any public official shall fail or participate in a failure or refusal to submit the question of the adoption of voting machine or machines at such general election upon presentation of a petition as above provided, his office shall be deemed vacant. If the vote be in favor of such adoption, a voting machine or machines sufficient in number to provide a machine for each 500 voters or fraction thereof shall be supplied for use at all elections occurring more than six (6) months thereafter in such city, village, incorporated town, county, or other governmental taxing division of the state; provided, that in cities which have adopted the provisions of Articles 6, 14 and 18 of this Act, and whose taxes are levied in accordance with provisions of so-called 'pegged' levies, before any such machine or machines are supplied after any such referendum, the proposition of supplying such machine or machines must first be approved by a vote of the city council of such city."

It seems clear to us that the proviso thus quoted refers to the sentences and the subject matter immediately preceding it and to which it is attached, that is, to the adoption and supplying of voting machines pursuant to a referendum

initiated by petition of ten per cent of the voters where the Board of Election Commissioners has failed or refused to submit the question to referendum on its own motion, and not to any referendum initiated by the Board of Election Commissioners. The rule applicable to the construction of provisos is accurately stated in *Anderson* v. *City of Park Ridge*, 396 Ill. 235.

The point is also made by appellants that the city council of the city of Chicago reserved its control over the expenditure of moneys for voting machines and that the machines should not be supplied except upon prior approval by a vote of the city council, which has never been given. It is conceded that the city council controls the financing of any moneys to be expended for the purchase of voting machines, but the parties are in serious disagreement as to what constitutes an approval for such expenditure.

At the outset there appears to have been a general understanding that voting machines were desirable for the conduct of elections in the city of Chicago. In November, 1946, the Board of Election Commissioners submitted the proposition for the use of voting machines, by referendum to the voters of that city, resulting in a tremendous expression of approval. In the meanwhile and shortly prior to that referendum the city council of the city of Chicago had passed a resolution favoring the adoption of the voting machine proposition. Later the finance committee of the city council asked for authority to consider the financing of the purchase of voting machines. The city council in September, 1947, unanimously passed an ordinance authorizing the issuance of $7,000,000 voting machine bonds. Following this ordinance in December, 1947, the city council in its annual appropriation ordinance included an item of $2,000,000 for paying the cost of voting machines, and in its tax-levying ordinance for 1948 provided for $300,000 to cover redemption and interest on voting machine bonds. Relying upon this course of con-

duct by the city, the Board of Election Commissioners proceeded to enter into a contract with the Automatic Voting Machine Corporation for the purchase of 450 voting machines. We are of the opinion that the action of the city council of the city of Chicago as above outlined was sufficient approval upon which the Board of Election Commissioners were authorized to select and purchase voting machines. We believe the intent of the legislature as expressed in the various sections of the Election Code was to vest in the Board of Election Commissioners the right and power to select and purchase voting machines and to empower the city council with complete control of the purse strings and the method of financing such purchase.

The other main issue in the controversy is whether the voting machines manufactured by the Automatic Voting Machine Corporation comply with the requirements of the Election Code. Amended section 24-11, incorporated in the Election Code of 1943 and covering the specification, reads as follows:

"The ballot labels shall be supplied by the official or officials or board charged by law with providing material or supplies for the holding of an election or elections, and shall be printed in black ink on clear white material of such size as will fit the machine and in plain, clear type, and shall provide space not less than one-half inch in height and one and one-half inches in width for the printing of each candidate's name, with such other wording as is required by law."

Appellants contend that the voting machines purchased by the Board of Election Commissioners are illegal, because, as constructed, they are not able to accommodate ballots which provide space one and one-half inches in width for the printing of each candidate's name; that, as a matter of fact, appellees exhibit 17, being an instruction model, demonstrates that the ballot label space is one inch in width and one inch in height, whereas the statute re-

quires a space of one and one-half inches in width and one-half inch in height, whenever the names of the candidates are printed horizontally.

We believe the discussion with reference to the voting machines being able to provide ballot labels printed diagonally at an angle of 30° is of little value. We gather from the record that it was the intention of the legislature to require the names of candidates to be printed horizontally.

Section 24-3 of the Election Code provides that the Secretary of State, and two persons appointed by the Governor, who shall be mechanical experts and not members of the same political party, shall constitute a board of voting machine commissioners. They must be wholly disinterested, and when an application for use is made by a party owning any voting machine, it is the duty of such board to examine the machine as to its accuracy, efficiency, capacity and safety, and make a full report thereon to the office of the Secretary of State. It is their duty to state in such report whether or not the machine so examined complies with the requirements of the Voting Machine Act.

In February, 1942, the Automatic Voting Machine Corporation submitted its machine for inspection to the State Board of Voting Machine Commissioners. That board examined the machine on two occasions, and during the same month issued its certificate in which it was certified that the machine was so constructed that it complied with all requirements specified in the Voting Machine Act and could be safely used by voters at elections under the conditions of the Election Code.

The instruction model, designated appellees' exhibit 17, is in evidence and has been demonstrated before this court. In the space provided for the ballot label it does not strictly comply with the requirements of section 24-11 of the Election Code, in that the space measures one inch in width instead of one and one-half inches. However, the specimens provided show that the names of the candidates are

printed in black ink on clear white material and so placed as to be perfectly plain and legible. Some of the machines have been used in two or three previous elections and, so far as the record discloses, there has been no complaint about confusion, fraud, corruption or lack of sufficiency over the use of the machines. We do not believe the legislature was as greatly concerned about the shape, size or form of the ballot label as it was to afford to the voters an opportunity to express their wishes in the selection of candidates for office. The trial court held, and we think correctly, that the machines were in substantial compliance with the law, and we so hold.

Because of the conclusions expressed, the judgments of the circuit court of Cook County, in both cause No. 30895 and cause No. 30896, are affirmed.

*Judgments affirmed.*