[Civ. No. 11078.   Third Dist.   Jan. 24, 1966.]

STATE OF CALIFORNIA ex rel. THE DEPARTMENT OF WATER RESOURCES, Plaintiff and Respondent, v. NATOMAS COMPANY, Defendant and Appellant.

Rogers, Clark & Jordan, Webster V. Clark, Bernard P. McCullough and Robert V. Blade for Defendant and Appellant.

Lyman Henry, W. Martin Tellegen and Hall, Henry, Oliver & McReavy as Amici Curiae on behalf of Defendant and Appellant.

Thomas C. Lynch, Attorney General, and F. G. Girard, Deputy Attorney General, for Plaintiff and Respondent.

VAN DYKE, J.*—This is a condemnation action brought by the state to acquire property necessary for the Feather River Project in Butte County.

On May 10, 1961, the Director of the Department of Water Resources adopted a declaration basically providing: "[I]t is necessary to acquire in the name of the State of California title in *fee simple* to certain parcels of real property in the

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

County of Butte. . . ." And that "[P]ublic interest and necessity require the acquisition of the real property interest . . . for the construction, maintenance and operation . . . by the State of the improvement for which the real property described herein is required. . . ." And that "[T]he real property interests herein described are necessary for such public improvement; [and] that it is necessary that *all of said real property interests be taken therefor.*" (Italics supplied.)

This declaration was concurred in by the California Water Commission.

On May 1, 1962, the Director of the Department of Water Resources adopted a supplemental declaration, stating in part: "[A] further investigation and study of the intended uses of the . . . real property interest have been made . . ." and ". . . public interest and necessity require the acquisition of the real property interest described . . . for *fish and wildlife enhancement, as provided in Sections 11900 through 11919, inclusive, of the Water Code of California, as a part of the construction, maintenance, operation and associated recreational development by the State of the improvement for which the real property is required.*" (Italics added.)

The lands of appellant were covered by both declarations. They lie southwest of the City of Oroville, in Butte County, and are located at distances varying from 5 to 10 miles from the site of the Oroville Dam on the Feather River for the construction of which they were to be acquired. During the period from 1900 to 1925 the appellant's lands were dredged for gold with the result that as of the date the present action was filed, May 22, 1962, there were some 41 million cubic yards, or 62 million tons, of dredger tailings, suitable for earth fill and for the making of concrete, left on the property above the residual sand table. The volume of material located on the 1,800 acres of the dredged lands belonging to appellant, hereinafter called "Natomas," comprises somewhat better than half the entire amount of rock and gravel of this type needed for the Oroville Dam.

Insofar as the first declaration is concerned, that is, the declaration of May 10, 1961, which made no mention of fish and wildlife enhancement, the trial court found that the public uses for which the subject lands were to be acquired were to use the "dredger tailings . . . as material for the construction of the earthen embankment of the Oroville Dam,

including as the result of the excavation and removal of said materials from said lands, the right to construct and maintain permanent training dykes, or levees to be located within approximately 312 acres of said lands for the purpose of containing the flow of the Feather River within its channel, and further including as the result of the excavation and removal of said material the right to subject those lands to inundation as a result of the fact that the removal of the dredger tailings will cause the land surface elevation to be lowered, with a consequent result that the ground-surface water level which corresponds with the surface elevation of the Feather River, will on frequent occasions be higher than the lowered land surface elevation, thereby resulting in substantial inundation. . . .''

As a result of the dredging operations the dredger tailings now occupy the top portion of the land and are underlaid by sand. The record establishes that the tailings on the Natomas lands will be removed down to the sand table, and the removal of the dredger tailings will result in the land surface elevation being substantially lowered. The dredger tailings and the underlying sands are quite pervious, and as these lands lie adjacent to the Feather River the groundwater elevation will correspond closely to the surface elevation of the river itself. The training dikes are not intended to be impervious and the waters from the river will percolate through the training dikes and the sands underlying them. And thus, as the river rises the groundwater level in these adjacent lands will rise. The record shows that these lands in the borrow area, after the rocks and gravel are removed with the consequent lowering of the land surface elevation, will be subject to substantial inundation beyond that previously experienced.

The Director of Water Resources testified that in adopting the declaration of May 10, 1961, and in making his determination therein to acquire the fee, he considered each of these public uses, that is, the removal of the dredger tailings, the construction and maintenance of the training dikes, and the inundation, and he felt it was necessary to acquire the fee. Nevertheless, the trial court concluded that these public uses did not entitle the plaintiff to condemn the property in fee simple and that the only interest plaintiff was authorized to acquire for these uses was a ''right of entry upon and occupation of said lands and the right to take therefrom such earth, gravel, and stones as may be necessary for the con-

struction of the earthen embankment of the Oroville Dam, and as the result thereof such further easements as may be necessary for the purpose of constructing and maintaining the aforesaid training dykes or levees and to subject said lands to the aforesaid possible periodic inundation resulting from the excavation and removal of said material therefrom.''

As noted above the supplemental declaration of the director of May 1, 1962, is concerned with fish, wildlife and recreational uses of the property. The trial court found as to these uses: ''That after the dredger tailings are removed from the lands . . . plaintiff State of California intends to use those lands for fish, wildlife, and recreational purposes associated with the Feather River Project.'' In addition to the declaration, the director testified in this case that it was the state's intent to use these lands for fish, wildlife and recreational purposes.

Commencing in June 1961 the Department of Fish and Game commenced a study directed to these lands and their potential for fish, wildlife and recreational purposes after the dredger tailings were removed. This study culminated in a report dated March 1962, and the director testified that the recommendations as set forth in that report were finalized insofar as the Department of Fish and Game was concerned. This report was submitted by the Department of Fish and Game to the Director of Water Resources, and after considering the project and concurring with the recommendations of the Department of Fish and Game, the director adopted the supplemental declaration of May 1, 1962. Specifically, this report contained the following statements: ''. . . The removal of gravel from this area will destroy most of the fish and wildlife habitat found in the tailings area. The numerous species of migratory wildlife associated with this habitat will be displaced and the resident fish and wildlife species largely destroyed. The tailings area will be largely leveled to sand-table elevation and contain numerous ponds and borrow pit excavations. The area will be subjected to periodical floodings during periods of spill from the Oroville Dam. It is expected that the revegetation of the area will occur by nature and the area will revert largely to a flood plain riparian plant community interspersed with an annual grass type with a scattering of trees.

''It is the opinion of the Department of Fish and Game that if the following recommendations are adopted, the Oro-

ville borrow areas will become ultimately an important fish and wildlife area and offer many opportunities for public outdoor recreation. We believe removal of rock piles from the tailing area will create an opportunity for enhancement of fish and wildlife in years to come. Natural revegetation of the area will be accompanied by a return of wildlife in increasing numbers. Warmwater fisheries will develop in those ponds remaining after the removal of the gravel.

"Furthermore, public ownership of these lands assures not only free access to 10 miles of the Feather River but, in addition, provides opportunities for fisheries management."

While the trial court found, as noted above, that the removal of the dredger tailings, the construction and maintenance of the training dikes, and the periodic inundations would not authorize the state to acquire the fee, it also found that "the determined use for fish, wildlife, and recreational purposes to which plaintiff State of California intends to [put] the property . . . , and those determined uses specifically set forth in Finding No. 10 above [hereinabove quoted], are public uses and do, when considered together, justify the condemnation by plaintiff State of California of the fee simple interest in the property of the defendant. . . ."

Natomas first contends that the state did not establish a case for the condemnation of the fee estate in appellant's lands and on the contrary has been shown to be entitled only to a lesser interest in the nature of a *profit à prendre* and consequential easements for the purpose of removing the desired material. We do not agree.

Section 11575 of the Water Code provides: "For the purpose of constructing, maintaining, and operating the project and for the purpose of providing and substituting new facilities for facilities to be taken or destroyed, the department may acquire for and in the name of the State, by . . . eminent domain proceedings any and all . . . land . . . and property or appurtenances thereto of every kind and description . . . as the department determines to be required and necessary for the proper construction, maintenance, and operation of the project and for effectuating the purposes and objects to be accomplished by the construction, maintenance, and operation of the project, and for providing and substituting new facilities for facilities taken or destroyed."

By section 11900 and following sections of the Water Code the Legislature has declared a policy that in the construction

of state water projects provisions be made for the preservation of fish and wildlife. The enhancement of fish and wildlife resources are among the purposes of state water projects. (§ 11900.) This declaration of policy specifically is made applicable to the Central Valley Project. (§ 11905.) Section 11900 also provides "that the acquisition of real property for such purposes be planned and initiated concurrently with and as part of the land acquisition program for other purposes of state water projects. . . ."

In order for the Department of Water Resources to condemn (see § 11580 of the Water Code for the grant of power) the director must make a declaration, concurred in by resolution of the California Water Commission, that public interest and necessity require the acquisition of the property. (§ 11581.) This declaration is conclusive evidence of the public necessity of the acquisition, that the property is necessary, and that the proposed acquisition is planned in a manner which will be most compatible with the greatest public good and the least private injury. (§ 11582.) Section 253 of the Water Code provides: "The department may acquire, either in fee or in any lesser estate or interest, any real property which it considers necessary for state water and dam purposes." This section when read with sections 11900 et seq. does authorize the taking of the fee.

Appellant argues that the provisions of section 11580, by referring to the Code of Civil Procedure to the effect that the condemnation and taking shall be under the provisions of the laws relating to eminent domain proceedings, require that we look solely to those sections to determine the interest which may be taken. (See Code of Civ. Proc., § 1237 et seq.) Section 1239 of the Code of Civil Procedure does not provide specifically that the condemner may take the fee when it acquires land for fish and wildlife enhancement. Appellant argues that therefore the interest can only be for an easement. But the provision of the Water Code should be construed to mean that the procedural provisions of the Code of Civil Procedure relating to eminent domain are applicable and not those pertaining to the estate which may be taken. This construction conforms to the stated legislative purpose.

It has been indicated that where the statute provides for the condemnation of land for public uses and purposes, or where any equivalent term is used, it will usually be construed to authorize the taking of the fee (see *McCarty* v.

*Southern Pac. Co.,* 148 Cal. 211, 221 [82 P. 615]), and this rule is reiterated in *Crockett Land & Cattle Co.* v. *American Toll Bridge Co.,* 211 Cal. 361, 364 [295 P. 328]. We think this rule of construction should be applied and that the statutes here should be construed to authorize the taking of the fee. Section 11575 authorizes the department to acquire by eminent domain proceedings rights of way, easements, land or property as the department determines to be necessary for effectuating the purposes of the project. Section 11580 provides for condemnation of "property." The latter term is an inclusive term and applying the cited rule would authorize the fee for the lands necessary to effectuate the purpose of enhancement of fish and wildlife which are to be planned with the project. The word "project" cannot limit the wildlife enhancement, as appellant contends, to the dam site because the dam will regulate the flow of the river below it. Such limitation would tend to nullify any conservation efforts below the dam.

Natomas argues that the Water Code sections contemplate "that the type of fish and wildlife and recreational facility which is contemplated by the Legislature in connection with State water projects is simply that which is seen every day on public reservoirs throughout this State, namely, boating facilities on the reservoir itself, camp sites and recreational areas immediately adjacent thereto and such protective devices for fish and game in the nature of fish ladders and the like which are built into the dam or other physical structures."

This argument comports with appellant's desire to narrowly construe the statutes involved. But a construction should be given which would be in accord with the purposes to be achieved. (*Redevelopment Agency* v. *Malaki,* 216 Cal. App.2d 480 [31 Cal.Rptr. 92].) There is no reason apparent to us why downstream facilities should not also be provided.

Natomas also contends that the Director of Water Resources did not act in good faith when the supplemental petition of May 1962 was enunciated which declared the lands were also needed for fish and wildlife purposes.

Section 11582 of the Water Code declares, in effect, that the resolution of public interest and necessity (§ 11581) shall be conclusive evidence of the public necessity of the acquisition and that the property is necessary. In *People* v. *Cheva-*

*lier,* 52 Cal.2d 299 [340 P.2d 598], where the question was presented in relation to condemnation for street purposes, the court said of a statute placing the question of necessity within the exclusive province of the condemning body (p. 307): ". . . In other words, the questions of the necessity for making a given public improvement, the necessity for adopting a particular plan therefor, or the necessity for taking particular property, rather than other property, for the purpose of accomplishing such public improvement, cannot be made justiciable issues even though fraud, bad faith, or abuse of discretion may be alleged in connection with the condemning body's determination of such necessity. To hold otherwise would not only thwart the legislative purpose in making such determinations conclusive but would open the door to endless litigation, and perhaps conflicting determinations on the question of 'necessity' in separate condemnation actions brought to obtain the parcels sought to carry out such a single public improvement. We are therefore in accord with the view that where the owner of land sought to be condemned for an established public use is accorded his constitutional right to just compensation for the taking, the condemning body's 'motives or reasons for declaring that it is necessary to take the land are no concern of his.' . . .''

██  The next contention of Natomas is that it was denied due process of law because by this court's previous decision it was precluded from litigating the question whether the dredger tailings are land or personal property. (Reference is to *State of California* v. *Superior Court,* 208 Cal.App.2d 659 [25 Cal.Rptr. 363].) It is conceded that the decision of this court in that case is the law of the case here. Therein this court held that the dredger tailings were land for the purpose of condemnation. A determination of this question was one of the key questions presented in that litigation. Oral and documentary evidence had been presented to the trial court when the state sought an order for immediate possession of Natomas' land. The trial court denied the order. Mandamus was brought in this court. The record of the proceedings below were made a part of the record on the mandamus proceedings, and this court, holding the tailings were land not personal property, granted the writ to compel the trial court to set the amount of the deposit and then to issue an order granting immediate possession.

The contention of Natomas that it was denied procedural

due process is devoid of merit. Natomas had a hearing on the question in this court. The essentials of due process of law are a regular and orderly procedure in a court of competent jurisdiction (*Harrington* v. *Superior Court,* 194 Cal. 185 [228 P. 15]; *Pennoyer* v. *Neff,* 95 U.S. 714 [24 L.Ed. 565]) before an impartial judge (*Tumey* v. *Ohio,* 273 U.S. 510 [47 S.Ct. 437, 74 L.Ed. 749, 50 A.L.R. 1243]; *In re Murchison,* 349 U.S. 133 [75 S.Ct. 623, 99 L.Ed. 942]); the defendant must have notice and an opportunity to be heard (*Griffin* v. *Griffin,* 327 U.S. 220 [66 S.Ct. 556, 90 L.Ed. 635]; *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865]; *Estate of Hampton,* 55 Cal.App.2d 543 [131 P.2d 565]); and the hearing must be fair (*Fewel* v. *Fewel,* 23 Cal.2d 431 [144 P.2d 592]). These essentials were present in *State of California* v. *Superior Court, supra.* This court had jurisdiction to entertain a petition for a writ of mandamus to compel the superior court to enter an order granting the state immediate possession of appellant's land. (*Central Contra Costa etc. Dist.* v. *Superior Court,* 34 Cal.2d 845 [215 P.2d 462].) Appellant was given notice and appeared. (*State of California* v. *Superior Court, supra,* 208 Cal.App.2d 659.) The record of the proceedings below were before this court and argument was had on the matter. There is no question that appellant was fully heard. ■ "Due process of law does not entitle a person to have a hearing before any particular . . . court. It is satisfied if he be given a fair hearing upon a reasonable notice before a . . . court having jurisdiction of the proceedings and the parties." (*Sherer* v. *City of Laguna Beach,* 13 Cal.App.2d 396, 402 [57 P.2d 157].)

■ Natomas further contends that condemnation was improper, saying that at the time this action was brought the state had not yet received a license from the federal government authorizing construction of an earth-filled dam at Oroville. The license, when granted, envisaged a concrete type structure.

The basic facts are not in dispute. The state in 1957 received a license from the Federal Power Commission to construct Oroville Dam. The license as then issued envisaged a concrete dam. The state filed an application with the Federal Power Commission on April 17, 1962, requesting it to approve the engineering drawings of an embankment dam, and the order of approval was issued by the Federal Power Commission on July 11, 1962. Notwithstanding that the

change from a concrete type to an earth-filled type constituted a most material change in the plans for the dam, nevertheless the license of the federal government to build a dam on the Feather River at the place originally requested and approved and of the same, or substantially the same, impounding capacity has continuously been held by the state and has been so held from the beginning. It is obvious that the granting of the license originally called for consideration of many things other than the type of dam to be constructed. There were such questions as to whether or not a dam should be built upon the Feather River at all, whether or not if it was to be built it should be located at one or another point upon the river, whether or not it should have the impounding capacity requested by the state's application, and many other questions. The application for the change from concrete to earth fill did not work an abandonment or revocation of the original license. Consequently, although this action was filed shortly before the federal government granted the requested change in the type of dam to be built, the trial court herein had jurisdiction of the action brought. The record discloses without conflict that the tailings upon the Natomas lands were adapted for the making of concrete. And although the amount of aggregate required for that purpose in the building of a concrete dam was vastly less than the amounts of the same material when used to make earth fill, such matters could not affect the jurisdiction of the court to proceed with the cause and could rise no higher than defenses to the action brought. No such defense was asserted by Natomas when it filed its answer, which filing occurred after the federal license had been amended to provide for an earth-fill dam.

Natomas contends that the jury failed to give any consideration to an agreement of sale to Butte Land Company of 145 acres of the land condemned. Under this agreement Natomas was to receive at least a total of $361,700. This 145 acres was a portion of what was called parcel 1, consisting of some 200 acres. The trial judge instructed the jury: "Evidence of a sale of the identical real property is admissible in determining the value of the property. Matters such as a change of value between the time of the sale and the time of the condemnation may be considered by you in weighing such evidence.

"In determining the market value of the property being

here condemned the recent bona fide purchase of the identical property would be of first importance."

The jury brought in a verdict of only $100,000 for the entire 200 acres. Appellant claims that this award showed the jury gave no consideration to the sale and relies on *Edwin Moss & Sons, Inc.* v. *Argraves*, 148 Conn. 734 [173 A.2d 505]. In that case the referee who determined the value of the property condemned stated in his report that he did not use the factor of sand and gravel (admittedly on the property condemned) because the evidence was insufficient. He did find the amount of sand and gravel and did find that a purchaser was under a contract to take the sand and gravel for 30 cents per cubic yard. The failure of the referee to consider the factor of sand and gravel insofar as it affected the market value was held to be error.

Whether the jury considered the contract of sale in determining the market value of the property sought to be condemned is something the record would not reflect. The valuation testimony as to this particular parcel ranged from $30,000 to $752,400. The jury awarded $100,000 or a price of $500 an acre. Since the verdict was in the range of the valuation testimony, it would normally be held to be supported. (See *People* ex rel. *Dept. of Public Works* v. *Pera,* 190 Cal. App.2d 497, 501 [12 Cal.Rptr. 129] ; *City of Gilroy* v. *Filice,* 221 Cal.App.2d 259 [34 Cal.Rptr. 368].)

The jury could have rejected the sale because there was evidence in the record from which one could infer the sale was suspect. Appellant had been notified prior to the sale that its lands were going to be acquired by the state. The contract called for appellant to pay a penalty if the lands were condemned. The deed was never recorded and title never passed. There may be a valid explanation for all of this but the jury could consider the transaction suspect. However, there is no affirmative showing here that the jury did not consider the sale in its valuation of the property. Such a sale would not be conclusive evidence on a jury but merely evidence. (Accord 5 Nichols, Eminent Domain (3d rev. ed. 1962) § 21.5.) The record here does not support the claim of error in respect to the contract of purchase.

Appellant next contends that it was error to admit the state's Exhibit 24 which was used to illustrate the testimony of one Thayer, a state witness, as to the extent of the inundation which would occur if the tailings on the property

were leveled and if the river flowed at a certain rate. The witness based his opinion, in part, on the elevation of the tailings after they were leveled. To determine this elevation the witness used the results of certain computations made by Aero Service Corporation, a firm which by a procedure known as the photogrammetric method determined the volume of materials on the ground. Appellant's complaint is that the alleged failure of the state to establish any foundation for the purported land elevations which appeared on the exhibit and which constituted a necessary premise that the lands would be inundated made the testimony and exhibit inadmissible.

The exhibit was admitted simply to illustrate Thayer's testimony and not as independent evidence.

The state produced as an expert one Robert Freer, a civil engineer and an employee of the firm which did the photogrammetry work for the state. He was responsible for the production of this work done by other employees. The study was made to determine the volume of earth in each area above a certain elevation. This area was divided into grids 2,000 feet square and the volume in each grid was computed. The work was started with aerial photography and then company personnel entered the area and did ground survey work to survey points of known elevation (about 150 points were surveyed). After the completion of this work the notes obtained were computed. This data, plus the aerial photographs, was inserted into a stereo-plotter and through the use of the machine the operator determined the elevation of the ground. The information obtained was punched automatically into an IBM card which was run into a computer and the total volume determined. At the time the work was done Freer was a member of the department and responsible for the Oroville project. The two employees who operated the stereoplotting machine had five years' experience. Freer did not do the work. The employees' work was spot checked and found accurate. The information as to volume was sent to the state and from these figures the state's witness testified as to inundation. He based his opinion on the volume computations furnished by the firm which did the photogrammetry and his own computations. He also relied on the elevations furnished. We think sufficient evidence was shown to permit the exhibit to be introduced in evidence as illustrative of the witness' testimony. An expert witness may base his opinion on testi-

mony by other experts. (*People* v. *Lewis,* 186 Cal.App.2d 585, 601 [9 Cal.Rptr. 263].)

Natomas contends that the trial court erred in not granting a new trial because of alleged misconduct of a juror, namely, Everett L. Sudduth. Appellant charges that juror Sudduth falsified on his *voir dire* examination concerning his qualifications as a prospective juror and further deliberately concealed his allegiance to one William H. P. Dolan, Jr., who later testified as an expert appraisal witness on behalf of the state. Says appellant: "Juror Sudduth answered falsely when he replied in the affirmative to the general question put to him on *voir dire* by counsel for Natomas as to whether his answers would be substantially the same as those given by other prospective jurors who had preceded him. Previously and late during the morning session juror John H. Lance had been asked by Mr. Girard whether he was personally acquainted with Messrs. Phillips, McFarland, Rhodes or Dolan and Lance had answered that he was not acquainted with any of them. Therefore on the face of the record Sudduth's answer to the general question constituted an express representation to the court and counsel that he likewise was not personally acquainted with any of these gentlemen, including Mr. Dolan. This was not the truth."

It appears that juror Sudduth was first asked on direct if he had heard the proceedings which had gone before. He answered yes. He stated that he did not know of anything which would affect his ability to render a fair and impartial verdict. He stated further that the state had previously purchased some land he had owned. He said he bore no ill will against the state. The questions asked about this purchase by the attorney for appellant were minimal. The details of the purchase were not explored. The final questions and answers asked of Sudduth on *voir dire* follow: "Q. You have listened to the other questions which were asked other prospective jurors this morning and this afternoon, have you? A. Oh, yes. Q. And with the exception of those who were excused, would your answers be substantially the same? A. I believe they would. Q. You have no preconceived ideas about this case one way or another? A. No, I haven't. Q. And you'd be willing to listen to the evidence and judge it fairly and squarely upon what your opinion of the weight of the evidence is and in accordance with His Honor's instructions then of the law, is that right? A. Yes sir."

Sudduth was examined in the afternoon. Examination of the jury began shortly after 10 a.m. It continued all morning and a portion of the afternoon before Sudduth was examined. Only one person who was examined in the morning on *voir dire* was specifically asked if he knew Mr. Dolan. But the juror who was examined immediately after Sudduth was asked if he knew Mr. Dolan and it was explained that he was an appraiser. Sudduth did not speak up and inform court and counsel that he knew Mr. Dolan, knew him rather well, and that Dolan had acted as appraiser for the state during negotiations for the purchase by the state from Sudduth of his property.

In support of the motion for a new trial appellant offered several affidavits, including one of a juror and one of an alternate juror.

Juror Lucille Crosier stated in her affidavit that immediately after Dolan's testimony for the state as to the value of the property being condemned Sudduth stated to her that he should not be on the jury because he knew Dolan well and had had business dealings with him; that Dolan had appraised property which Sudduth had sold to the state and in Sudduth's words had given him "an excellent deal." Mrs. Crosier stated that on other occasions during the trial she heard Sudduth tell other jurors that he considered Dolan to be fair and that he believed that the appraiser's opinion concerning the value of the property was the one that should be followed. This last opinion, she said, was reiterated during the deliberations of the jury.

The alternate juror stated that on June 27 Sudduth, while Sudduth, another juror and the two alternates were driving home, began to praise Dolan. Sudduth stated that he was well acquainted with Dolan whom he saw several times a week; that Dolan was a very competent appraiser who was fair and honest in his business dealing and that he would have to accept Dolan's figures; that he, Sudduth, considered himself obligated to Dolan for the advantageous price the state had paid for Sudduth's property.

A third affidavit contained hearsay statements that Sudduth stated to other jurors that he had done business with Dolan and found him to be very fair.

Dolan's deposition was also before the court. The gist of it was as follows: Dolan met Sudduth for the first time when he went to the latter's home in connection with the state's pro-

posed purchase of Sudduth's property. He had one interview with Sudduth during which he obtained information necessary to make his appraisal. Following the interview Sudduth made one inquiry—if the appraisal had been completed. Dolan sees Sudduth on occasions in Chico. The two have chatted with one another on these chance meetings. They have no social relationship.

The affidavit of Sudduth stated that he approached the state and asked it to purchase his property and that he met the two state appraisers once—one of whom was Dolan. He had no discussions with the appraisers concerning the purchase and since that time Sudduth had seen Dolan on the street and had chatted with him briefly. They had never lunched together nor were they friendly socially.

Sudduth denied making any statement to the effect that because of his friendship with Dolan, or because of his favorable appraisal, he had to go along with Dolan's testimony. He denied stating that he saw Dolan constantly or that he believed that Dolan's opinion concerning the value of the property should be followed. He further denied stating that he was intimately acquainted with Dolan or that he considered himself a close personal friend, or that he had to accept Dolan's appraisal. He also denied stating to any person that as a result of Dolan's appraisal he received $4,000 more for the property than he otherwise would have obtained. He asserted that he never had any discussion with anyone concerning his qualifications as a juror or whether he should have been permitted to serve as a juror.

In regard to his failure to tell of his acquaintance with Dolan, Sudduth stated: "I never at any time, during the examination of me by the attorneys concerning my qualifications intended in any manner to misstate any facts, and I believe that all my answers concerning my qualifications were to the best of my ability honestly given. If I had been asked as to whether I knew Mr. Dolan, I would, of course, have answered in the affirmative. If I had been asked by the attorneys as to the details of my sale of property to the state I would have related them."

Sudduth did admit pointing out Dolan to another juror and he conceded he may have stated he was acquainted with Dolan and that Dolan was an appraiser employed by the state to appraise his ranch. He specifically denied stating that he felt obligated to Dolan or that he had a close personal relationship with him. He did say he felt Dolan would be

fair, but he also said the same about two of appellant's appraisers.

It is apparent that there is serious conflict as to Sudduth's activities and statements to other jurors during the trial. This was noted by the trial court and the court stated in denying the motion for a new trial: "There is certainly quite a conflict in the matters presented by the various affidavits. These factual conflicts are resolved in the State's favor."

In *Kollert* v. *Cundiff*, 50 Cal.2d 768 [329 P.2d 897], the court pointed out that there are two situations where an affidavit of a juror may be used to impeach the verdict. One by statute (resort to chance, Code Civ. Proc., § 657, subd. 2) and the other judicially created (bias or disqualification of a juror which has been concealed by false answers on *voir dire*.) The *Kollert* case emphasizes that (p. 773): ". . . The problem involves the balancing of two conflicting policies. It is, of course, necessary to prevent instability of verdicts, fraud, and harassment of jurors, and, on the other hand, it is desirable to give the losing party relief from wrongful conduct of the jury." The question presented here falls within one of the recognized exceptions, and the jurors' affidavits were properly presented and considered in ruling on the motion. (*Williams* v. *Bridges,* 140 Cal.App. 537 [35 P.2d 407].) ▮ The rule is stated in *Forman* v. *Alexander's Markets,* 138 Cal.App.2d 671, 674 [292 P.2d 257], as follows: ". . . Thus, affidavits of jurors are admissible which relate to occurrences during the trial and the deliberations of the jury tending to establish the bias of a juror or other prejudicial circumstance existing at the time of his impanelment which he concealed during the *voir dire* examination directed to that point. (*Shipley* v. *Permanente Hospital,* 127 Cal.App. 2d 417 [274 P.2d 53, 48 A.L.R.2d 964] : *Pollind* v. *Polich,* 78 Cal.App.2d 87, 92 [177 P.2d 63] ; *Williams* v. *Bridges,* 140 Cal.App. 537 [35 P.2d 407].) But such affidavits must be accompanied by an affirmative showing that neither the moving party nor his counsel had knowledge of such dereliction on the part of the juror prior to the rendition of the verdict. (*Sherwin* v. *Southern Pac. Co.,* 168 Cal. 722, 726 [145 P. 92] ; *Newman* v. *Los Angeles Transit Lines,* 120 Cal. App.2d 685, 694 [262 P.2d 95] ; *Gray* v. *Robinson,* 33 Cal. App.2d 177, 183 [91 P.2d 194] ; *Lafferty* v. *Market Street Ry. Co.,* 7 Cal.App.2d 698, 702-703 [46 P.2d 996].) ▮ In the sound discretion of the court, ' "A new trial may be

granted upon the ground a juror made untrue answers to questions asked upon his *voir dire if it appears the moving party was not aware of the falsity at the time of the completion of the impanelment of the jury, and did not discover such fact during the trial and before the rendition of the verdict.*" ' (Italics added.) (*Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal.2d 480, 495 [55 P.2d 870].)"

Other rules which also must be kept in mind are " 'The granting or denial of a motion for a new trial rests so completely within the discretion of the trial court that an appellate court will not interfere unless a patent abuse of discretion appears. There must first be an "affirmative showing of a gross, manifest or unmistakable abuse of discretion" [citation] . . . Since all intendments are in favor of the action taken by the lower court, the affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but all facts reasonably inferred from those stated. . . .' " (*Brickell* v. *Wittmar*, 175 Cal.App.2d 190, 195-196 [345 P.2d 494].)

The most serious statements attributed to juror Sudduth as establishing bias or prejudice toward appellant appear in affidavits of juror Crosier and alternate juror Witchell. They may be epitomized as follows: (a) ". . . I shouldn't be on this jury and I don't see why I wasn't excused." (b) "I know Dolan well and we are on very friendly terms." (c) "[B]ecause of my friendship with him and what he has done for me I simply have to go along with this testimony. I shouldn't be serving on this jury." (d) "Dolan appraised my property which I sold to the State a couple of years ago and he gave me an excellent deal. I see him constantly and in view of my friendship for him and what he has done for me in the past I simply have to go along with him." (e) "[T]hat Dolan's opinion concerning the value of the Natomas property was the one which should be followed." (f) "[T]hat he was intimately acquainted with Mr. Dolan to the point that he considered him a close personal friend and that he felt that he would have to accept the figures testified to by Mr. Dolan as the value of the Natomas property." (g) "[T]hat as the result of the appraisal of Mr. Dolan he had obtained $4000 more from the State than he would have received if either of the prior agreed sales had been completed." (h) "[T]hat he considered himself obligated to Mr. Dolan for having been able to dispose of his property at an advantageous price to the State."

(i) "[H]e should not have [been] permitted . . . to stay as a juror." As noted, Sudduth denied making each of these statements, and juror Mayhew who was in the group to whom the statements were alleged to have been made said he never heard them made. In view of the trial court's resolution of the conflict we here must accept that finding.

It is interesting to note that the values which Dolan in his testimony as an expert witness gave to the property of appellant totaled the sum of $271,800. The jury's verdict for the same property valuations totaled $526,904.

The trial judge stated that he could not find "from the record of the trial nor the . . . affidavits, that juror Sudduth intentionally concealed any bias, prejudice, or other disqualification by a false answer on *voir dire*"; and stated that the "NATOMAS COMPANY was not denied a fair and impartial jury." It is our conclusion that the trial court's determination was well within the scope of judicial discretion and ought to be accepted and sustained on appeal.

The judgment and order are affirmed.

Pierce, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied February 17, 1966, and appellant's petition for a hearing by the Supreme Court was denied March 22, 1966. Peek, J., and Mosk, J., did not participate therein.