[Civ. No. 10559. Third Dist. Oct. 18, 1962.]

STATE OF CALIFORNIA ex. rel. Department of Water Resources, Petitioner, v. THE SUPERIOR COURT OF BUTTE COUNTY, Respondent; NATOMAS COMPANY, Real Party in Interest.

Stanley Mosk, Attorney General, and F. G. Girard, Deputy Attorney General, for Petitioner.

No appearance for Respondent.

Webster V. Clark, Bernard P. McCullough, Rogers, Clark & Jordan and Robert V. Blade for Real Party in Interest.

SCHOTTKY, J.—This is a petition by the State of California to compel the superior court to make an order granting the state immediate possession of certain lands which contain dredger tailings owned by the real party in interest, Natomas Company.

The superior court refused to issue its order granting immediate possession of the lands in question because the superior court was of the opinion that the lands are not lands to be used for reservoir purposes within the meaning of article I, section 14, of the Constitution.

Mandamus is the proper remedy to secure an order of immediate possession where the superior court has erroneously refused to issue an order granting immediate possession. (*Central Contra Costa etc. Dist.* v. *Superior Court,* 34 Cal.2d 845 [215 P.2d 462].) The fact that eventually the state may obtain an order of possession by judgment is not a satisfactory substitute for the order for immediate possession sought herein. (*Central Contra Costa etc. Dist.* v. *Superior Court, supra.*)

The facts in the instant proceeding disclose that the state has received a license from the Federal Power Commission to construct an earth-filled dam on the Feather River. A contract for the construction of the dam has been let. The state desires to use dredger tailings on certain lands located approximately 6 miles below the dam site, which are owned by the Natomas Company, for the construction of the dam. Oroville Dam is to be constructed as an earth embankment structure. It will rise some 735 feet above the bed of the Feather River and when completed will impound 3,484,200 acre feet of water over 15,485 acres of land. Some 78 million cubic yards of dredger tailings will be used to comprise the earth fill of the embankments of the proposed dam. Part of the tailings are involved in this action.

The lands in controversy here were dredged between 1900 and 1925. The purpose of the dredging operation was to profit from the sale of the gold and platinum and the value of the sand, gravel and boulders for aggregates. The method of the dredge operations essentially was as follows: A bucket scooped undredged materials from the area which was being dredged. The material obtained was dumped into a hopper from which it went into a revolving screen which separated the larger materials, over three-fourths of an inch in size, from smaller matter. The larger materials went to the end of the screen and were dumped onto a conveyor belt which carried them to the end of the dredge where the materials were dis-

charged. The smaller materials were treated to recover the gold and platinum and the residue was also discharged. Everything that was scooped out of the pond in which the dredge was operated was returned to the pond except the precious metals. No particular manner of operation was employed to take into account the value of the rocks.

Natomas operated a rock crushing plant in Oroville until 1929 and engaged in the aggregates business until 1929. Dredger tailings on land owned by Natomas were used as the raw material for the plant. In 1929 all the dredged lands were leased as land to Pacific Coast Aggregates at a minimum rental plus royalties. A portion of these lands are now being sold under an installment sales contract. The particular lands in controversy have never been used since the conclusion of the dredging operations. The Natomas Company has never filed any statement with the county tax officials showing that the dredger tailings are personal property. The lands have always been taxed as real property.

The first question presented is whether the state is entitled to an order of immediate possession (assuming the dredger tailings are land) of the lands.

Article I, section 14, of the State Constitution provides: "Private property shall not be taken or damaged for public use without just compensation having first been made . . ., and no right of way or lands to be used for reservoir purposes shall be appropriated to the use of any corporation, except a municipal corporation or a county or the State or metropolitan water district, municipal utility district, municipal water district, drainage, irrigation, levee, reclamation or water conservation district, or similar public corporation until full compensation therefor be first made . . . in any proceeding in eminent domain brought by [one of the above corporations '. . . or similar public corporation'] the aforesaid . . . may take immediate possession and use of any right of way or lands to be used for reservoir purposes . . . upon . . . giving such security . . . as the court in which such proceedings are pending may direct, . . ."

The argument presented to the voters in support of the amendment permitting immediate possession of lands to be used for reservoir purposes read: "It has long been the policy of this State, approved by the people of California, that sovereign agencies such as the State itself, or counties or cities, should have the right, when lands are required for rights of way such as roads and highways, to take immediate posses-

sion upon payment into court of the amount fixed by the judge to cover any award by the jury as the value of the land. This same authority, so far as concerns land for rights of way, also now exists in the case of irrigation, drainage, levee and reclamation districts.

"The reasons for this policy are obvious. Unless the State highway authorities, or the county or city, could take possession, upon payment into court of the amount fixed as compensation, of property required for highways, roads or streets, private property owners could hold up for years the construction of our highways. Since the sovereign agency must be entitled to eventually obtain the required property, it has long been recognized that the practical and sensible thing was to allow the public agency to take possession at once so that construction work and development would not be delayed.

"With the increased need for conserving and utilizing our water resources this same authority is found necessary in so far as applies to lands for reservoir sites. If the policy is wise as to rights of way for roads, streets, canals and ditches, it would seem to be equally sound and necessary in the case of reservoir sites.

"Likewise, the authority which is found necessary for irrigation drainage, levee and reclamation districts should obviously likewise be available to the new and recently created types of districts, such as metropolitan water districts, municipal utility districts, municipal water districts and water conservation districts.

"This amendment does away with the unfair discrimination which now exists between districts performing the same functions.

"This amendment simply extends the policy that has long been recognized, not only as desirable, but as absolutely necessary in order that government may carry on its functions. Unless this amendment is adopted it will be possible for one individual to hold up in litigation for many years the construction of essential works for the public's development or utilization of water.

"An owner of private property can in no way be injured by this amendment, for he is protected in his rights by full compensation, whereas the people as a whole are greatly benefited in enabling projects to be constructed immediately, instead of being subjected to long and expensive delay through the arbitrary action of an individual property owner in refusing to accept a reasonable price for his property."

As stated in the argument to the voters, the object of the amendment was to facilitate early construction of reservoir projects. The object and purpose sought to be accomplished by an amendment to the Constitution is an important factor in ascertaining the intent of the electorate in adopting such amendment (*City & County of San Francisco* v. *County of San Mateo,* 17 Cal.2d 814, 818 [112 P.2d 595]), and the argument in favor of the adoption of a constitutional amendment sent to the electorate is some evidence of the intent with which it was adopted even though it is not controlling. (*Cypress Lawn Cemetery Assn.* v. *City & County of San Francisco,* 211 Cal. 387 [295 P. 813].)

The amendment provided for immediate possession of "lands to be used for reservoir purposes." It does not by its terms contain any limitation that immediate possession may only be had of land to be used for reservoir sites, though in one portion of the argument the phrase is used. The purpose of the amendment was to provide for prompt construction of essential works for the public development or utilization of water. If land is needed for the construction of a reservoir, it is land for reservoir purposes whether it is the site of the dam or land containing necessary materials for the construction of a project which has as its purpose the creation of a reservoir. To narrowly construe the amendment would defeat its purpose. Such construction would be improper. (See *Central Contra Costa etc. Dist.* v. *Superior Court, supra* [34 Cal. 2d 845], where the amendment was liberally construed.)

The second question is whether the dredger tailings are land. It has been stated that "The miner who owns the ore owns the tailings and débris, unless the instrument which creates the mineral interest provides otherwise. He may dispose of them as personalty; he may simply dump them and treat the dump as a part of his land; or he may abandon them, by relinquishing possession and by intending thereby to relinquish ownership." (4 American Law of Mining, tit. XXI, Tailings and Débris, pp. 101-102.)

In discussing the question whether mine tailings are personalty or real property the Arizona Supreme Court said in *Steinfeld* v. *Omega Copper Co.,* 16 Ariz. 230 [141 P. 847, at page 848] : ". . . The vital fact to be determined is whether the ore was so annexed to the realty and remained so annexed thereto as to become a part and parcel thereof. If so, it passed with the conveyance of the mines. The intention with which the owner of the property extracted the ore from the

ground and the purpose and intention of the owner with which it was placed on the dump is controlling in arriving at a solution of the question of whether the ore after having been extracted and placed in the dump was personalty or realty.

"Only one witness testified relative to these matters. This witness was Fred G. Hughes. The 'Old' Omega Copper Company owned the mines, and Hughes was its superintendent. Under Hughes' supervision the ore was extracted. He testified:

" 'At the time I took that ore out we had no intention of doing anything with it. . . . There was simply—naturally in working a mine, you have got to get rid of your waste or ores that you are using, and it was just put out on the dump to give us a chance to develop and get out better ore to send to the smelter. In other words, I moved it out there to get a chance to get out our better ore to send to the smelter. At the time we took that ore out and put it on the dump, it at that time had no value.'

"This evidence is of such a substantial nature that a jury would be justified in drawing the natural inference therefrom that the owner's purpose and intention in extracting the ore from the ground and placing it on the dump was not to sever the ore from the realty, but to remove a part of the realty from the workings underground to the surface, then such removal had no effect to change the character of the ore moved. It remains realty. No one has ever contended that because the owner of realty removes a portion of earth from one part of the premises to another that such portion removed necessarily becomes personal property by reason of the fact of removal."

 Whether tailings are land or personalty is ordinarily a question of fact. (*Manson* v. *Dayton*, 153 F. 258 [82 C.C.A. 588]; *Conway* v. *Fabian*, 108 Mont. 287 [89 P.2d 1022].) It is only if one inference can be properly drawn from the evidence that the question is one of law. (3 Witkin, California Procedure, Appeal, § 88, pp. 2251-2252.) We believe that as a matter of law the dredger tailings involved in this case are land. When the lands were dredged the rocks and aggregates were returned to the pond. No particular method of operation was followed in order to take into account the value of the rocks. Since these lands were dredged they have not been used in any manner. Natural vegetation has grown throughout the area. The property has been treated as land by Natomas both in conveyances and in leases. Natomas has paid only real property taxes on the land. There are no facts

in the record to show that Natomas ever treated or dealt with the property as personalty. The evidence that the purpose of the operation in part was to profit from the value of the sand, gravel and aggregates does not permit an inference that the tailings were personalty. The material scooped up by the dredge was returned to the approximate location from which it was removed except the larger materials were on the surface. Such an operation can not change the nature of the tailings to personalty. ■■ But, even if Natomas had treated the property as personalty, nevertheless for the purposes of a condemnation action it would be considered land. (*City of Los Angeles* v. *Hughes*, 202 Cal. 731, 737 [262 P. 737].) The dirt and aggregates removed from land and then redeposited on land are land for the purposes of condemnation.

For the above reasons a writ of mandate will issue requiring the superior court to vacate its previous order and fix the amount of deposit necessary to secure the real party in interest the prompt payment of just compensation upon the condemnation of the property. When this is done the court shall make an order giving the State of California immediate possession and use of the property sought to be condemned.

Peek, P. J., and Pierce, J., concurred.

A petition for a rehearing was denied November 13, 1962, and the petition of the real party in interest for a hearing by the Supreme Court was denied December 12, 1962.