[Civ. No. 42273. First Dist., Div. One. May 15, 1979.]

DIAMOND INTERNATIONAL CORPORATION,
Plaintiff and Respondent, v.
ROGER BOAS, as Chief Administrative Officer, etc.,
Defendant and Appellant.

COUNSEL

Thomas M. O'Connor, City Attorney, Thomas A. Toomey, Jr., Chief Deputy City Attorney, and Burk E. Delventhal, Deputy City Attorney, for Defendant and Appellant.

McCutchen, Doyle, Brown & Enersen, David M. Balabanian, James L. Hunt and Donn P. Pickett for Plaintiff and Respondent.

OPINION

**SIMS, J.**\*—Appellant, the Chief Administrative Officer (hereinafter CAO) of the City and County of San Francisco, has appealed from a judgment awarding respondent, a New York corporation, the manufacturer of an approved punch card computerized voting system[1] denominated "Datavote," a permanent injunction enjoining and restraining the CAO from interfering with the registrar of voters' selection of a computer voting system to be used in the city and county.[2] The CAO contends that the function and personnel of the office of the registrar of voters were administered by a director of finance and records as part of the department of finance and records which in turn was expressly placed under the control of the CAO by the city and county charter,[3] and

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1]Division 11 of the Elections Code, sections 15000-15369, as revised in 1976 (Stats. 1976, ch. 246, § 3 and ch. 1438, § 17) deals generally with voting systems and voting machines, their approval, their selection, and the conducting of elections in which they are used. Both "Datavote" and its competitor, "Votomatic," are approved systems.

[2]The full text of the injunction is as follows: "It is ordered, adjudged and decreed that:

"A permanent injunction hereby issue, enjoining and restraining defendant Boas, his agents, servants, employees, and all persons acting in concert and participation with them, and each of them, from doing or causing to be done, directly or indirectly, any of the following acts or things:

"Interfering with, disturbing or overruling or seeking or attempting to interfere with or to disturb or to overrule the Registrar of Voters for the City and County of San Francisco in his conduct, management and control of all matters pertaining to elections in the City and County, and particularly in the Registrar of Voters' selection of a computer voting system to be used in the City and County; and

"Selecting, ordering or requisitioning or seeking or attempting to select or to order or to requisition a voting system for the City and County of San Francisco for any election on the basis of his authority and against the authority of the Registrar of Voters."

[3]The Charter of the City and County of San Francisco as adopted November 2, 1971, and approved and filed with the Secretary of State December 7, 1971 (Stats. 1971, Res. ch.

that therefore he was fully authorized to countermand the selection of Datavote which had been made by the registrar.

Respondent claims that the plain meaning of other sections of the charter, particularly when viewed in the light of the judicial interpretation of similar provisions of an earlier charter, conclusively demonstrates that the registrar, as found by the trial court, had the exclusive authority to select a voting system. The resolution of these conflicting contentions is complicated because the adoption of a voting system involves not only the choice of the medium through which the voters are going to express their preference, i.e., ballot, machine, punch card, or other system, but also the selection and the requisitioning and purchase of particular equipment. From our examination of the charter and the relevant sections of the Elections Code, we conclude that the registrar does not have the exclusive right to assert a preference in either respect. The judgment must be reversed.

The matter came before the court on motions for summary judgment interposed by each of the parties. The parties stipulated at the hearing below that there are no triable issues of fact. The facts were developed through the exhibits to the complaint and the depositions, with accompanying exhibits, of the CAO and the registrar.

In May of 1976, the incumbent assumed the duties of Registrar of Voters-Recorder for the City and County of San Francisco. This is a civil service position that he obtained by competitive examination. Very early in his tenure he became aware of the pressing need for a new voting system. He conducted an extensive personal investigation of the available

---

273, p. 4538 et seq.) codified the provisions of the 1932 charter. Section 3.510 provided in pertinent part: "The functions, activities and affairs of the city and county that are hereby placed under the direction of the chief administrative officer by the provisions of this charter, and the powers and duties of officers and employees charged with specific jurisdiction thereof, shall, subject to the provisions of section 11.102 and section 3.501 of this charter, be allocated by the chief administrative officer, among the following departments: [¶] Department of Finance and Records, which shall include the functions and personnel of the offices of tax collector, registrar of voters, recorder, county clerk and public administrator, and shall be administered by a director of finance and records who shall be appointed by the chief administrative officer and hold office at his pleasure. . . ." (Stats. 1971, p. 4612.)

On November 7, 1978, section 3.510 was amended, and the second paragraph was revised to read as follows: "Department of Governmental Services, which shall include the functions and personnel of the offices of registrar of voters, recorder, public administrator and such other functions as may be assigned by the chief administrative officer, and shall be administered by the chief administrative officer." Since the CAO acknowledgedly was the officer responsible for the order of the director of finance and records which caused the withdrawal of the registrar's selection of Datavote, there is no change in the posture of the case by the amendment.

systems over a period of some six months. His conclusions were submitted in a report to the CAO dated March 25, 1977.

The strong preference of the registrar was for the Datavote system manufactured by respondent. The relative merits of the Datavote system and its competitor, the Votomatic, are not at issue; but the registrar calculated their respective total capital and lease purchase costs at $1,047,623 for Datavote, and $1,572,406 for Votomatic.

The appellant took office as the CAO on January 3, 1977. He was appointed by the mayor and confirmed by the board of supervisors. On taking office, he soon became aware of the registrar's study of voting systems. He did not pay very much attention to the registrar's report when it came to him. His concern about the registrar's competence, his belief that selection of the system was his responsibility, and city hall "paranoia" connected with inaccuracies in the count at a recent election led him to appoint a committee to independently consider the alternatives.

The committee, which contained representatives from the mayor's office, the board of supervisors, the city attorney, the League of Women Voters, the city purchaser, and an electronic data processing expert, met four times and unanimously recommended the Votomatic system. The CAO, having made no personal comparison, decided to accept the committee's recommendation, and reported it to the mayor and board of supervisors on April 15, 1977.

The registrar responded to the committee's considerations and reaffirmed his belief that Datavote was the better system in a memorandum to the CAO dated April 19, 1977. The committee met with the registrar to discuss his response on April 29, 1977, but did not change its recommendation.

A special election was planned for August 2, 1977, and the registrar submitted requisitions for the Datavote equipment. On May 5, he received a memorandum instigated by the CAO from the director of finance and records ordering him to requisition Votomatic instead. He complied.

On May 10, 1977, respondent filed its complaint for declaratory and injunctive relief against the CAO praying for the relief which was granted by the trial court. (See fn. 2 above.) The injunction was predicated upon

the court's minute order reading as follows: "Plaintiff and Defendant stipulated in this court on July 20, 1977, that there are no triable issues of fact and that summary judgment is the appropriate and proper method of disposing of this action. [¶] Plaintiff's motion for summary judgment is granted as to the first and second causes of action to the extent that this court declares that the Registrar of Voters for the City and County of San Francisco has the exclusive authority under Secs. 9.102 and 3.201 of the City Charter to select a voting machine system for the City and County in that the choice of a voting machine system is a matter pertaining to the conduct of elections, a subject matter under the exclusive authority of the Registrar of Voters. [¶] A permanent injunction will issue as prayed for in the plaintiff's complaint. [¶] Defendant's motion for summary judgment is denied. [¶] Costs to plaintiff."

This appeal followed the entry of the permanent injunction.

Before examining the applicable charter provisions and precedents and their application to the foregoing facts, we pause to comment on the questionable nature of plaintiff's standing to sue, and the lack of parties to resolve all of the issues which the CAO and the respondent now seek to have adjudicated.

I

Appellant at one point in its brief states: "As will become clear below this case involves only the question of who has authority to make a selection of a voting system for San Francisco." He later distinguishes between the requisitioning process and the appropriation of money to make the purchase of the equipment. He states: "The instant case only deals with the requisitioning process." He suggests that the final decision is in the board of supervisors through its control of appropriations and because of provisions found in the Elections Code which appear to give the board of supervisors the authority to adopt a voting system.[4]

---

[4]The Elections Code, since January 1, 1977 (Stats. 1976, ch. 246, § 3 and ch. 1146, § 2), has provided as follows: "§ 15023. The governing board may adopt for use at elections any kind of voting system or any combination of voting systems or any combination of a voting system and paper ballots provided that the use of the voting system or systems involved has been approved by the commission or specifically authorized by law. . . ." (Since amended by Stats. 1978, ch. 836, § 3.)

"§ 15201. A governing board may adopt a system provided for in this division for any or all precincts within its jurisdiction, and for any portion or all of any election. The election official may, from time to time, combine, rearrange, or enlarge the precincts for which such system is adopted, provided no direct primary or general election precinct shall include more than 1,000 voters [other limitations deleted Stats. 1978, ch. 836, § 3].

Respondent also has acknowledged: "This case concerns the *selection* of a voting system, not the *purchase* of a system"; and "Thus, both sides agree, and have from the start, that the Board of Supervisors controls the purchase of a voting system." In respondent's original brief it agreed with the CAO that the state law (Elec. Code, § 15201, see fn. 4 above) gives the "governing board," and neither the CAO nor the registrar, the authority to adopt a voting system. Nevertheless it appears to claim that the board of supervisors can only "adopt" or reject a system selected by the registrar.

In view of that posture of the case each side was requested to comment on whether ultimate authority in the final analysis rests exclusively with the board of supervisors. The CAO persisted in his original analysis which suggested an affirmative answer. Respondent, however, furnished an analysis of the statutory history of the provisions noted above (see fn. 4), and principles of statutory construction which tend to support the view that the registrar, as successor to the former board of election commissioners, has the exclusive right to adopt or not adopt a voting system under the provisions of the Elections Code. It appears from the record and respondent's supplemental brief that the August 2, 1977, special election was held with Votomatic equipment secured through the requisition the registrar was ordered to execute. Following the trial court's judgment, elections in November 1977 and June 1978 were conducted with the respondent's Datavote system. Respondent asks us to take judicial notice that on July 24, 1978, the board of supervisors unanimously adopted a resolution selecting the Datavote system; that the mayor vetoed that resolution on August 4, 1978; that on September 11, 1978, the board by a vote of six to five reversed itself and adopted a resolution, approved the next day by the mayor, adopting the Votomatic system; and that on January 29, 1979, on reconsideration of the matter, the full board defeated a new resolution calling for the use of Datavote.

Although we released from Pandora's box the thorny problems inherent in a review of the propriety of the subsequent acts of the board of supervisors, we decline the invitation to pass on their legality. Neither the board of supervisors, the mayor, the registrar nor Votomatic is a party to this action. We have the city attorney and its chief administrative

---

The governing board may cease to use such system in any or all precincts or elections under its jurisdiction."

"Governing board" is not defined in the code, but section 15004 reads: " 'Elections official' means any county clerk, city clerk, registrar of voters, elections supervisor, or governing board having jurisdiction over elections within any county, city, or district within the state."

officer before the court, but we hesitate to consider the rights and obligations of the board, the mayor and the respondent's competitor vis-á-vis the registrar, except as they may be peripherally involved in the original dispute between the CAO and the respondent.

■ This brings us to the question of the standing of the respondent to bring this suit, and the problem of whether the registrar, whose rights and obligations are at stake, should have been made a party. An examination of the allegations of respondent's complaint reflects that this is not a taxpayer's suit under the provisions of section 526a of the Code of Civil Procedure.[5] It is not alleged that respondent corporation is a taxpayer. The gist of the action is not to prevent the expenditure of money. It is an attempt to insure that if any money is spent it will flow into the coffers of respondent. (Cf. *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 159-160 [101 Cal.Rptr. 880, 496 P.2d 1248]; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-270 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; and 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 122, pp. 1792-1793.)

Section 367 of the Code of Civil Procedure requires, with an exception not applicable here, "Every action must be prosecuted in the name of the real party in interest . . . ." It appears that the registrar, who is not a party to this action, is the real party in interest in establishing his freedom from control by the director of the department of finance and records, the CAO and the board of supervisors. If the registrar and the CAO should resolve their differences would the respondent have a right of action? If respondent is unsuccessful on this appeal will the registrar be estopped from relitigating the same question? It appears to us that the posture of the matter before the trial court placed respondent in the position of an unsuccessful bidder on a public contract where the awarding authority reserves the right to and does reject all bids, or otherwise exercises reserved discretion. (See *Stanley-Taylor Co.* v. *Supervisors* (1902) 135 Cal. 486, 488 [67 P. 783]; *Rubino* v. *Lolli* (1970) 10 Cal.App.3d 1059, 1062 [89 Cal.Rptr. 320]; *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 816-817 [25 Cal.Rptr. 798]; *Judson Pacific-Murphy Corp.* v. *Durkee* (1956) 144 Cal.App.2d 377, 382

---

[5]Code of Civil Procedure section 526a provides in pertinent part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. . . ."

[301 P.2d 97]; *Charles L. Harney, Inc.* v. *Durkee* (1951) 107 Cal.App.2d 570, 580 [237 P.2d 561, 31 A.L.R.2d 457]; and *Laurent* v. *City & County of S.F.* (1950) 99 Cal.App.2d 707, 710-711 [222 P.2d 274]. Note also *Old Town Dev. Corp.* v. *Urban Renewal Agency* (1967) 249 Cal.App.2d 313, 331-332 [57 Cal.Rptr. 426], where, as here, a selection process was involved.)

Similarly it has been established that an unsuccessful bidder at, or a stranger to, a sale under a deed of trust cannot assert the trustor's possible objections to the manner in which the sale was conducted. (See *Block* v. *Tobin* (1975) 45 Cal.App.3d 214, 221 [119 Cal.Rptr. 288]; and *Monolith Portland Cement Co.* v. *Tendler* (1962) 206 Cal.App.2d 800, 806 [24 Cal.Rptr. 38].) Finally we note that the rendering of advisory opinions falls within neither the functions nor the jurisdiction of an appellate court. (See *People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126].)

Under the parties' original concession nothing was certain until the board of supervisors actually appropriated money for the use of the equipment. Such a decision was made, but, as we have seen, this action is not based on the theory that funds were allegedly illegally paid to Votomatic for equipment furnished at the August 1977 election.

We point out our reservations concerning the right of respondent to bring this action to obviate any assumption that in considering the merits of the controversy before the trial court we approve of the right of the purveyor of goods or services to sue a public body, in the absence of a showing of a contractual relationship, particularly where its rights, if any, must depend on the exercise of discretion by a public officer or employee, who is not even made a party to the action.

Nevertheless we are impelled to consider the merits to the extent indicated above. The CAO has not objected that the respondent is not the real party in interest and otherwise lacks standing to sue. The trial court assumed that the parties were properly before it, and the parties submitted the matter on that basis. The CAO would be estopped to challenge that assumption at this late date. (See *International Assn. of Fire Fighters* v. *City of Palo Alto* (1963) 60 Cal.2d 295, 299 [32 Cal.Rptr. 842, 384 P.2d 170].) We therefore consider the merits.

## II

The 1900 charter (ratified by election May 26, 1898, approved by the Legislature Jan. 26, 1899, and effective Jan. 8, 1900; Stats. 1899, Res. ch. 2, p. 241 et seq.) created a department of elections (art. XI; Stats. 1899, p. 344) governed by a board of election commissoners (art. XI, ch. I; *id.*). Section 1 of chapter I of article XI provided in part: "The conduct, management, and control of the registration of voters, and of the holding of elections, and of all matters pertaining to elections in the city and county, shall be vested exclusively in and exercised by a board of election commissioners, consisting of five members, who shall be appointed by the mayor, and shall hold office for four years." (*Id.*) The remaining provisions of the section fixed the compensation for each commissioner, and established qualifications, staggered terms, and limitations on the appointing power, all aimed at preventing domination by any one political party. Section 2 restricted the commissioners' participation in political activities. (*Id.*) Section 3 provided for the organization of the board, and included the following: "The board shall appoint a registrar of voters, who shall receive an annual salary of twenty-four hundred dollars. The registrar shall be the secretary of the board, and shall keep a record of its proceedings, and shall execute all orders and enforce all rules and regulations adopted by the board. The term of office of registrar shall be four years." (*Id.,* at p. 345.) Section 4 provided for clerical assistants, subject to the article on Civil Service, and section 5 provided for the application of general election laws of the state to elections and registration of voters. Chapter II dealt with "Municipal Elections."

In 1903 the Legislature established a state commission on voting or ballot machines, and provided: "The board of supervisors, or other board having charge and control of elections in each of the counties, and cities and counties, cities or towns of the state, may . . . provide for and *require* the use of a voting or ballot machine, or machines . . . ." (Stats. 1903, ch. 226, §§ 1 & 2, pp. 262-263, italics added.) A similar provision is found in 1911 amendments. (Stats. 1911, ch. 492, § 2, p. 980.) In the latter year, article XI of the charter, chapters III, IV and V dealing respectively with "The Initiative," "The Referendum," and "The Recall" were added (Stats. 1911, Res. ch. 25, pp. 1661, 1670-1679), and provisions concerning those subjects which had been added to chapter I were repealed. Chapter II was amended to provide details concerning municipal elections. (*Id.,* pp. 1679-1686.) Subdivision (h) of section 6 recognized "Voting machines" and provided: "In the event of the use of voting machines, the ballot shall be arranged on the machines in the same form in each

assembly district as provided for the printed ballot." (*Id.,* p. 1684.) In 1917 the same language was placed in section 14 of chapter II when that chapter was revised. (Stats. 1917, Res. ch. 9, pp. 1708, 1719.)

In 1923 the Legislature recast the law concerning voting machines. (Stats. 1923, ch. 96, p. 182.) Section 5 provided in part: "The board of supervisors or other board having charge and control of elections in each of the counties, and cities and counties, cities or towns, of the state may adopt for use at elections any kind of voting machine approved by the state commission on voting machines, or the use of which has been specifically authorized by law; and thereupon such voting machine may be used at any or all elections held in any county, city and county, city, town or any political subdivision thereof for voting, registering and counting votes cast at such elections. . . ." (*Id.,* p. 185.) In the same year the Legislature had approved charter amendments, ratified by the voters on November 22, including an amendment to make section 14 of chapter II read as follows: "In the event of the use of voting machines the arrangement of the ballot, the counting of the vote, the canvass of returns and the determination of the result shall be governed by the general laws of the State." (Stats. 1923, Res. ch. 2, pp. 1261, 1268.)

In that year the board of election commissioners adopted a resolution providing for the purchase and use of 52 voting machines. A taxpayer sought a writ to compel the registrar of voters to print ballots which would comply with the provisions of section 19 of chapter II of article XI prescribing preferential voting. (*Ashe* v. *Zemansky* (1923) 192 Cal. 83, 84-85 [218 P. 591].) It was apparent that under the terms of the charter the use of voting machines would eliminate the preferential voting system. The court phrased and met the major challenge to the charge as follows: "The most serious question presented, however, is as to the power of the board of election commissioners. It is urged that voting machines for use in municipal elections could only be adopted by the people by charter amendment. The most obvious difficulty with this contention is that it deprives section 14 [of chapter II] of article XI of the charter of all force whatever. If there was no authority in the city or any of its officials to use voting machines there was no occasion whatever for providing for the consequences of the use of such machines, for if the machines could only be authorized by the amendment to the charter, at the time the charter was amended, it could equally well be provided what the effect of their use should be. It would seem clear that the people, in adopting the charter amendment in 1922, article XI, section 14, contemplated that

either the board of supervisors, who constitute the legislative body of the city, or the board of election commissioners, either under the charter or when thereto authorized by the state legislature, might adopt voting machines for use at municipal elections, and it is our duty to give some effect to this amendment to the charter if it is possible so to do. [¶] At first blush it would seem that the far-reaching consequences resulting from the use of voting machines as provided by article XI, section 14, should not come within the jurisdiction of an administrative body which merely controls the conduct of elections. But calling the board of election commissioners an administrative body does not solve the problem, because if they have legislative powers under the express provisions of the charter, the fact that their ordinary duties are those of an administrative character would not detract from the plain mandate of the charter, for the people in adopting a charter are not required to separate the judicial, legislative and executive departments of the government, but may adjust the municipal affairs provided for by the charter in any way that is satisfactory to themselves. It is clear that the adoption of voting machines comes under the general authorization contained in section 1 of chapter 1, article XI, of the charter, giving the board of election commissioners control 'of all matters pertaining to elections in the City and County of San Francisco.' The adoption of voting machines is clearly a 'matter pertaining to elections' in the city and county of San Francisco, and for that reason it would seem to be clear that if there is anywhere in the charter authority for a municipal officer or body to adopt voting machines, such power would be vested in the board of election commissioners, and this notwithstanding the fact that the general legislative body of the city is the board of supervisors [citations]." (*Id.,* pp. 86-87.)

The court also noted that the state law, although not binding for a municipal election controlled by the charter, provided that the board of election commissioners could adopt voting machines for use at a general election. It pointed out in support of its conclusion that it would be unreasonable to so acquire the machines and then not use them at a municipal election. (192 Cal. at pp. 87-88.)

*Ashe* v. *Zemansky* was not the only litigation in which the powers of the board of election commissioners were considered. In 1927 the power of the board of supervisors to fix the compensation of city employees was questioned. In *Fitzgerald* v. *Badaracco* (1927) 202 Cal. 18 [258 P. 937], the court ruled that "the power of the board of public works in the matter of the fixation of the compensation of its employees was subject to the limitation imposed by the budget provisions and taxing limit of" the

charter prior to the adoption of the charter amendments of 1924. (202 Cal. at pp. 21-22. Cf. *Niceley* v. *County of Madera* (1931) 111 Cal.App. 731, 737 [296 P. 306].) In *Griffin* v. *Boyle* (1927) 202 Cal. 95 [259 P. 729], it was claimed that the foregoing principle did not apply to the budget of the department of elections because section 4 of chapter I of article XI of the 1900 charter purported to give the board autonomy in fixing the salaries of its employees. The court held that the budgeting provisions in section 3, chapter I of article III of the charter as amended November 4, 1924, controlled. (202 Cal. at pp. 97-98.) As a corollary, in a subsequent case, Division Two of this court denied a claim for attorneys' fees presented by the attorneys for the board in the *Griffin* v. *Boyle* case. The court stated: "The authorities cited by appellants we deem not to be in point because not dealing with controversies between two departments of the same municipality. This is not a case where counsel were employed to represent the municipality in an action with another party, but is an inter-departmental controversy. The board of election commissioners is a department of the city government and its powers are not such as to make it function independently from the other departments of the city government. *Griffin* v. *Boyle* (*Jackson* v. *Badaracco*), *supra,* and *Fitzgerald* v. *Badaracco,* 202 Cal. 18 . . ., illustrate this point. While there are authorities which permit the employment of special counsel instead of the city attorney or district attorney under special circumstances making such action necessary, we have been referred to none which apply [*sic*] that rule to a controversy between two departments of the same municipal corporation." (*Glensor, Clewe & Van Dine* v. *Andriano* (1929) 99 Cal.App. 607, 608 [278 P. 1060].) It reiterated what had been decided earlier: "The controversy appears to have been only a difference of opinion or judgment as to how much money would be necessary for election purposes for the fiscal year. The amount necessary to be allowed in the budget has been held to be a matter which is by law confided to the board of supervisors rather than to the other departments of the municipality. [Citations.]" (*Id.,* p. 609.)

On January 8, 1932, a new charter, ratified by the electorate on March 26, 1931, and approved by the Legislature and filed with the Secretary of State on May 5, 1931, went into effect. (Stats. 1931, Res. ch. 56, p. 2973.) The board of election commissioners was abolished. In lieu of the former provisions section 173 under the title "Elections" and subtitle "Registrar of Voters," provided, in words identical to those lodging powers in the board in 1900: "The conduct, management and control of the registration of voters, and of the holding of elections, and of all matters pertaining to elections in the city and county, shall be vested exclusively in the registrar

of voters." The section continued: "Except as in this charter otherwise provided, he shall succeed to the powers and duties of the board of election commissioners at twelve o'clock noon on the 8th day of January, 1932, at which time the terms of the members of said board shall terminate, and such board as theretofore existing shall be abolished." (Stats. 1931, Res. ch. 56, § 173, p. 3082.) The language of the first sentence was embodied in section 9.102 of article IX, "Elections," as the charter was codified in 1971. (Stats. 1971, Res. ch. 273, p. 4852.)

At the same time the charter divided administrative responsibility between the mayor (§§ 35-52; Stats. 1931, Res. ch. 56, pp. 2997-3009) and the newly created office of chief administrative officer (§§ 59-61; *id.,* pp. 3013-3016). Section 61 placed the registrar of voters in the department of finance and records in language substantially the same as that found in section 3.510 of the codified charter adopted in 1971, as noted above. (See fn. 3. Cf. Stats. 1931, Res. ch. 56 p. 3014.) The general powers of the CAO were defined as follows in section 60: "The chief administrative officer shall be responsible to the mayor and to the board of supervisors for the administration of all affairs of the city and county that are placed in his charge by the provisions of this charter and by ordinance, and to that end he shall have power and it shall be his duty to exercise supervision and control over all administrative departments which are under his jurisdiction; . . ." (Stats. 1931, Res. ch. 56 p. 3013, Codified Stats. 1971, § 3.201, p. 4602.) In 1948 the following provision was added to section 60 of the charter: "The chief administrative officer may designate the recorder to exercise the powers and perform the duties of the registrar of voters and to occupy the offices of registrar of voters and recorder, receiving a single salary therefor to be fixed in accordance with the salary standardization provisions of this charter." (Stats. 1948, ch. 7, p. 207. Codified Stats. 1971, Res. ch. 273, § 3.201, p. 4603.)

In 1976 the electorate ratified an amendment to section 3.201 (former § 60) so that it now reads: "The chief administrative officer shall be responsible to the mayor and to the Board of Supervisors for the administration of all affairs of the city and county that are placed in his charge by the provisions of this charter and by ordinance, and to that end, *except as otherwise provided in section 9.102 of this charter, and the general laws of this state respecting the registration of voters, the holding of elections and all matters pertaining to elections in a city and county,* he shall have power and it shall be his duty to exercise supervision and control over all administrative departments which are under his jurisdiction; . . ." (Stats. 1976, Appen. Charters, ch. 14, p. 33, italics added.)

■ The respondent asserts that the plain meaning of the charter as found in section 9.102 and section 3.201 as recently amended, and as interpreted in *Ashe* v. *Zemansky,* compels the conclusion that the registrar has the exclusive authority over election matters, including the selection of a voting system.[6] Its position is supported by respectable precedent. ■ "It is axiomatic that in the interpretation of a statute where the language is clear, its plain meaning should be followed. (45 Cal.Jur.2d, Statutes, § 108, p. 621.)" (*Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].) The courts are bound to interpret the clear language of a statute according to its usual and ordinary import. (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 442 [134 Cal.Rptr. 650, 556 P.2d 1101]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665]; *People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1] [cert. den., 340 U.S. 879 (95 L.Ed. 639, 71 S.Ct. 117)]; and *Hazelwood* v. *Hazelwood* (1976) 57 Cal.App.3d 693, 698 [120 Cal.Rptr. 384].)

If we confine our examination of the charter to the provisions upon which respondent relies, it appears that "[t]he adoption of voting machines is clearly a 'matter pertaining to elections' in the city and county of San Francisco . . : ." (*Ashe* v. *Zemansky, supra,* 192 Cal. at p. 87.) The authority to adopt voting machines was vested in the board of election commissioners (*id;* and see *People* v. *City of Chicago* (1949) 403 Ill. 134 [85 N.E.2d 667, 672-673]). It is therefore fairly arguable that the same authority vested in the registrar under the charter which became effective in 1932, and under its codification in 1971 and amendment of 1976. ■ Generally statutes which are amended with wording similar to that in preexisting statutes are construed as though the enacting body had knowledge of the judicial decisions which construed the prior law. (See *Enyeart* v. *Board of Supervisors* (1967) 66 Cal.2d 728, 735 [58 Cal.Rptr. 733, 427 P.2d 509]; and *Property Research Financial Corp.* v. *Superior Court* (1972) 23 Cal.App.3d 413, 421 [100 Cal.Rptr. 233].)

■ In *Leroy T.* v. *Workmen's Comp. Appeals Bd., supra,* the court quoted the following with approval: " 'One who contends that a provision

---

[6]Compare, however, *Farley* v. *Healey* (1967) 67 Cal.2d 325 [62 Cal.Rptr. 26, 431 P.2d 650], where the majority of the court rejected a contention, advanced by the two dissenting justices that the provisions of section 173 of the 1932 charter which provide that the " 'control of . . . all matters pertaining to elections . . . shall be vested exclusively' " in the registrar, gave him the power to refuse to certify an initiative measure because he considered it was not within the power of the electorate to adopt. (Italics omitted.) (67 Cal.2d at pp. 336-337.)

of an act must not be applied according to the natural or customary purport of its language must show either that some other section of the act expands or restricts its meaning, that the provision itself is repugnant to the general purview of the act, or that the act considered in pari materia with other acts, or with the legislative history of the subject matter, imports a different meaning.' (2A Sands, Statutes and Statutory Construction (4th ed. of Sutherland, Statutory Construction, 1973) § 46.01, p. 49.)" (12 Cal.3d at p. 438. See also *Great Lakes Properties, Inc.* v. *City of El Segundo, supra,* 19 Cal.3d at pp. 155-166.) ▇ The CAO has accepted that challenge and contends that other provisions in the charter restrict the plain meaning found in the section upon which respondent relies; that to so construe the authority of the registrar is repugnant to the general purpose of the charter; and that when the provisions of section 9.102 are considered *in pari materia* with the other charter sections and the provisions of the Elections Code, they should have a more limited meaning.

▇ The charter is like a constitution and the following principles must be applied: "Under familiar rules of construction, if it is impossible to harmonize or reconcile portions of a constitution, special provisions control more general provisions, and the general and special provisions operate together, neither working the repeal of the other. [Citations.] Recourse may be had to the whole instrument to ascertain the intent and purpose of its provisions and it should, if possible, be construed so as to avoid a repugnancy." (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723] [app. dism., *sub nom. Western Air Lines, Inc.* v. *California* (1954) 348 U.S. 859 (99 L.Ed. 677, 75 S.Ct. 87)]. See also *People* v. *Anderson* (1972) 6 Cal.3d 628, 637 [100 Cal.Rptr. 152, 493 P.2d 880] [cert. den., 406 U.S. 958 (32 L.Ed.2d 344, 92 S.Ct. 2060)]; and *Martin* v. *Election Commissioners* (1899) 126 Cal. 404, 411 [58 P. 932].) Moreover the entire charter may be resorted to in order to determine the proper meaning of any section, and an interpretation which would render a portion meaningless should be avoided. (See *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 573 [203 P.2d 758]; and *Wilshire Oil Company of California* v. *Costello* (9th Cir. 1965) 348 F.2d 241, 243.)

▇ Respondent has not squarely met the provisions found in section 173 of the 1932 charter which read: "*Except as in this charter otherwise provided,* he [the registrar] shall succeed to the powers and duties of the board of election commissioners . . . ." (Stats. 1931, Res. ch. 56, p. 3082, italics added.) Reference to the other provisions of the charter reflects the administrative control over the registrar that was conferred on the CAO

through the department of finance and records and its directors, (1932 Charter, § 61; codified 1972, § 3.510; see fn. 3 above.) Furthermore the 1932 charter set up detailed provisions for "Budget and Fiscal Procedure" (§§ 69-87, Stats. 1931, Res. ch. 56, pp. 3019-3031; codified, as modified, 1972 in §§ 6.100-6.313, Stats. 1971, Res. ch. 273, pp. 4667-4683), and for "Purchasing" (1932 Charter, §§ 88-90, Stats. 1931, Res. ch. 56, pp. 3031-3033; codified, as modified, 1972 in §§ 7.100-7.104, Stats. 1971, Res. ch. 273, pp. 4690-4693). So far as is pertinent here, in 1932 section 88 provided: "The purchaser of supplies shall purchase all materials, supplies and equipment of every kind and nature, and enter into agreements for all contractual services required by the several departments and offices of the city and county, except as in this section otherwise provided. . . ." (Stats. 1931, Res. ch. 56, § 88, p. 3031.) We find no exception for the registrar's office or the department of finance and records of which it was a part. The section continues: "All purchases shall be by written purchase order or written contract. . . . All contracts and purchase orders in excess of two thousand dollars ($2,000) for material, supplies or equipment shall require the signature of the chief administrative officer in addition to the signature of the purchaser of supplies. . . . [¶] Purchases of equipment shall be made in accordance with specifications furnished by the department requiring such equipment in case the use of such equipment is peculiar to such department. For patented or proprietary articles sold by brand name, the purchaser may require each department requisitioning same by such brand name, to furnish specifications of the article requisitioned and may advertise for bids on the basis of such specifications, under conditions permitting manufacturers of or dealers in other articles made and sold for the same purpose to bid on such specifications or on the specifications of their own product. If the purchaser of supplies recommends the acceptance of the lowest or best bid, stating his reasons in writing therefor, and if the department head concerned recommends the acceptance of any other bid, on such proprietary articles, stating his reasons in writing therefor, the award shall be determined by the controller." (Codified, Stats. 1971, Res. ch. 273, pp. 4690-4691, § 7.100.)

Section 89 provided: "All purchase orders and contracts shall be based on written requisitions . . . ." (Id., Res. ch. 273, p. 4693, § 7.103.)

These provisions reflect fiscal controls over the registrar's office similar to those giving rise to restraints on the board of election commissioners. (See *Griffin* v. *Boyle, supra,* 202 Cal. 95; and *Glensor, Clewe & Van Dine* v.

*Andriano, supra,* 99 Cal.App. 607.) This relationship is not unusual and is found in state financial controls through the Department of Finance. (See *Treu* v. *Kirkwood* (1954) 42 Cal.2d 602, 609 [268 P.2d 482]; *State* v. *Brotherhood of R. R. Trainmen* (1951) 37 Cal.2d 412, 422 [232 P.2d 857] [cert. den., 342 U.S. 876 (96 L.Ed. 658, 72 S.Ct. 166)]; and *Ireland* v. *Riley* (1935) 11 Cal.App.2d 70, 72 [52 P.2d 1021].) In the case last cited the State Board of Equalization claimed that a statute directing it to sell excise stamps authorized it to secure the printing of such stamps free from fiscal controls. The state Department of Finance had refused to approve a proposed contract with the high bidder.[7] The court ruled that the later authorization did not repeal or control the general provisions requiring approval by the state Department of Finance. It stated: "The unmistakable purpose of the Legislature in adopting this section of the code is to conserve the financial interests of the state, and to prevent, as far as possible, any improvident acts by any of the departments thereof; to give to the state such powers as would enable the department of finance to control the expenditures of state money by any of the several departments of the state. The general powers extend to the supervision of all the financial and business policies of the state, which necessarily include supervision of the expenditure of moneys belonging to the state." (11 Cal.App.2d at p. 72.)

Under the 1932 charter the electorate provided for a decentralization of powers, but it is clear that the board of supervisors retained budgetary control, and that those departments under the CAO, even where authorized to contract, exercised such power subject to his approval. (See *Kennedy* v. *Ross* (1946) 28 Cal.2d 569, 575, 577-578 and 576-577 [170 P.2d 904]. Cf. *Madison* v. *City & County of S.F.* (1951) 106 Cal.App.2d 232, 239-240 [234 P.2d 995, 236 P.2d 141].)

We return again to the amendment of section 3.201 (former § 60) in 1976. Does the language "except as otherwise provided in section 9.102 of this charter, and the general laws of this state respecting the registration of voters, the holding of elections and all matters pertaining to elections in a city and county" render the registrar free of all administrative control? ■ We recognize that it is a general rule of statutory construction that a court will interpret a measure adopted by a vote of the

---

[7]In *Ireland* v. *Riley,* the low bid was $27,000 and the accepted and unapproved bid was for $107,250. Here it has been estimated that the lease purchase price of Datavote is $1,047,623, and that for Votomatic is $1,572,406. Neither the trial court nor this court has been called upon to review the respective merits and demerits of each system. We do recognize that durability, operation and maintainance costs over a period of years may render equipment of a cheaper price less of a bargain than a more expensive one.

people in such a manner as to give effect to the intent of the voters adopting it. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278]; *Burger* v. *Employees' Retirement System* (1951) 101 Cal.App.2d 700, 702-703 [226 P.2d 38].) In the case last cited the court quoted with approval from *State* v. *Listman* (1930) 157 Wash. 229 [288 P. 913, 915]: " 'The words must be read in a sense which harmonizes with the subject-matter and the general purpose and object of the amendment, consistent of course with the language itself. The words must be understood, not as the words of the civil service commission, or the city council, or the mayor, or the city attorney, but as the words of the voters who adopted the amendment. They are to be understood in the common popular way, and, in the absence of some strong and convincing reason to the contrary, not found here, they are not entitled to be considered in a technical sense inconsistent with their popular meaning.' " (101 Cal.App.2d at pp. 702-703.) To ascertain the intent of the electorate it is proper to consider the official statements made to the voters in connection with propositions of law they are requested to approve or reject. (See *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 653 [298 P.2d 1] [app. dism., *sub nom. Heisey* v. *County of Alameda* (1956) 352 U.S. 921 (1 L.Ed.2d 157, 77 S.Ct. 224)]; *People* v. *Knowles, supra,* 35 Cal.2d 175, 182; and *State of California* v. *Superior Court* (1962) 208 Cal.App.2d 659, 664 [25 Cal.Rptr. 363].)

██ The material submitted to the voters highlights the dispute here.[8] It does assist in determining what are "election matters." It is clear that

---

[8]The Voters' Information Handbook submitted to the voters at the primary election of June 8, 1976, stated in part: "Ballot Title [¶] Shall all matters pertaining to voter registration and elections be vested exclusively in the Registrar of Voters? [¶] Analysis By Ballot Simplification Committee [¶] Proposition A—Election Responsibilities of the Registrar of Voters.

"THE WAY IT IS NOW: The Charter does not state clearly who is in charge of election matters. One part of the Charter says that the Registrar of Voters is in charge of all election matters. But another part of the Charter says the Chief Administrative Officer is responsible for all activities of the Registrar of Voters.

"THE PROPOSAL: Proposition A states that the Registrar of Voters shall be the only person in charge of election matters. The Chief Administrative Officer will continue to be responsible for any other activities of the Registrar of Voters.

"A YES VOTE MEANS: If you vote yes, you want the Charter to say clearly that the Registrar of Voters shall be the only person in charge of election matters.

"A NO VOTE MEANS: If you vote no, you want the Charter left the way it is even though it does not state clearly who is in charge of election matters."

The handbook also sets forth in large capital letters: "(A) VOTER REGISTRATION AND CONDUCT OF ELECTIONS," followed by "ARGUMENT FOR PROPOSITION 'A' [¶] Authority of Registrar of Voters, Elections." The argument submitted by Supervisor John L. Molinari, states: "Vote Yes on Proposition 'A'—a measure to provide for the full independence and authority of the Registrar of Voters regarding the registration of voters, holding of elections, and all matters pertaining to elections in San Francisco. [¶] Over the

"voter registration" and the "conduct of elections" are such. Nevertheless, both the analysis by the ballot simplification committee and the argument for the charter amendment recognize that there are other activities of the registrar. The former states: "The Chief Administrative Officer will continue to be responsible for any other activities of the Registrar of Voters." The latter provides, euphemistically and hopefully, "Proposition 'A' clarifies and delineates carefully the relationship between the Registrar of Voters and the Chief Administrative Officer, so that the appropriate general management and administrative direction of the Chief Administrative Officer over the office of Registrar of Voters as a government activity is preserved, while making it clear that the functions of the Registrar of Voters concerning voter registration and the conducting of elections are the sole responsibility of the Registrar of Voters." (See fn. 8 above.)

From the foregoing it does not appear that the voters intended to relieve the registrar from fiscal and other administrative controls found in the charter, which do not impinge on his activities while registering voters and while conducting elections. In 1976 there was no attempt to change the chain of administrative command found in section 3.510. We also note that in 1978, when that section was amended to delete the intermediate authority of the department and director of finance and records, the registrar of voters was retained as one of the subordinate offices. (See fn. 3 above.)

It is true as contended by respondent that the nature of the equipment used is a matter pertaining to an election in that it affects the manner in which the election will be conducted. *Ashe* v. *Zemansky, supra,* so held. There, as in this case, there was no interdepartmental or inter-office dispute as to the necessity for a change in the method of voting. The resistance to change came from outside the governmental family. That

---

past months considerable attention has been focused on the conduct of voter registration and of election procedures generally. It has become very clear that the Registrar of Voters must be able to perform the duties of the office free of even the slightest possibility of interference, pressure or undue influence from any source except as specifically provided for by laws governing those functions and duties. [¶] Proposition 'A' clarifies and delineates carefully the relationship between the Registrar of Voters and the Chief Administrative Officer, so that the appropriate general management and administrative direction of the Chief Administrative Officer over the office of Registrar of Voters as a government activity is preserved, while making it clear that the functions of the Registrar of Voters concerning voter registration and the conducting of elections are the sole responsibility of the Registrar of Voters. [¶] Vote Yes on Proposition 'A'—make it absolutely clear that responsibility for the vitally important functions of the Registrar of Voters is entrusted to the person duly appointed to that position, and that the Registrar is assured of independence of authority for the proper performance of duties."

case, unlike this case, did not involve a dispute as to the specific type of equipment to be purchased to implement the change. Apparently all concerned were satisfied with the equipment selected by the board of election commissioners. In that case the board of election commissioners, unlike the registrar, was a completely autonomous department of government with a history of having been created independently by the Legislature. (See Stats. 1878, ch. 252, p. 299; *San Francisco* v. *Broderick* (1896) 111 Cal. 302, 307 [43 P. 960]; and *People* v. *Hoge* (1880) 55 Cal. 612, 614.) We find *Ashe* v. *Zemansky* is not controlling on the question raised by the judgment of the trial court.

Respondent insists that unless the registrar is given the exclusive right to select the voting system and equipment to be used to conduct the elections for which he is responsible, the whole election process will be subjected to political influences. That argument does not survive scrutiny. The fact that the CAO selected representatives of the supervisors, the mayor and the city attorney to be on his advisory committee did not, as respondent admits, corrupt the election process. It gave officials, whose visibility to the public rendered them subject to criticism when the election machinery broke down, an opportunity to assist in selecting the equipment. It would appear that the more people were involved in the selection process and the more it was openly debated, the less opportunity there would be for corruption in that selection. It is nowhere suggested that either machine would lend itself to corruption of the election process itself.

Here, it is unnecessary to determine whether the registrar has the exclusive power to make the original selection of the manner of voting which shall be used in the city and county. (Cf. 1972 Charter, § 9.102 with Elec. Code, §§ 15023 and 15201, fn. 4 above.) All parties concerned are agreed that a punch card computerized voting system should be substituted for the existing system.

We do rule that in the purchase of equipment to implement that change the registrar is subject to the fiscal controls found in the charter; that the CAO by virtue of his authority over the director of the department of finance and records, which embraced the office of the registrar, and by virtue of his obligation to advise the board of supervisors on fiscal affairs, had the power and authority to investigate and recommend the type of equipment which would best serve the city and county over the long period under consideration. The injunction is too broad, and unwarrantedly curbs the legitimate powers of the CAO. The

most we can say for the respondent is that the CAO should not have forced the registrar to give up his right to recommend and requisition, subject to disapproval, the equipment he considered most fitted to conduct elections in the future.

The judgment is reversed.

Racanelli, P. J., concurred.

**NEWSOM, J.**—I respectfully dissent.

The majority opinion, while disclaiming any intention of holding that the registrar has or has not the exclusive power to select a voting system* for San Francisco, necessarily and in my view erroneously holds, contrary to *Ashe* v. *Zemansky* (1932) 192 Cal. 83 [218 P. 591], that the registrar, as successor to the elections board, lacks such power.

I realize that, as Charles Lamb wrote, "all words are no more to be taken in a literal sense at all times than a promise given to a tailor," but in my view, nothing could be clearer from a perusal of the relevant statutes and their history than that, since the matter is one "pertaining to the conduct of elections" (cf. § 3.201 of the charter), the *selection* of a system is a matter solely within the registrar's authority.

Whether fiscal powers possessed by other city officials might prevent implementation of the respondent's choice is an issue not before us, as the parties themselves have agreed. As appellant candidly concedes, "The instant case only deals with the requisitioning process," and again, "[the case] involves only the question of who has authority to make a selection of a voting system."

The majority opinion deems it unnecessary to decide that question, but in my view, however convoluted its exegesis, it can only be read as approving the illegal actions of the chief administrative officer in flouting the plainly expressed legislative purpose of section 3.201 of the charter.

A petition for a rehearing was denied June 13, 1979. Newsom, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied July 20, 1979. Clark, J., was of the opinion that the petition should be granted.

---

*The opinion seems to me ostensibly to pass upon questions which the parties agree are not before us.